Davis, Judge,
delivered the opinion of the court:
John R. Keener is a career government employee who first entered the federal service in 1937 as an Assistant National Bank Examiner in the Office of the Comptroller of the Currency. There he stayed until the advent of World War II when, in 1942, he joined the Navy as a lieutenant. After he was honorably discharged into the Naval Reserve in 1946, he took private employment, first as assistant vice president of a bank in Illinois and, later, as vice president of a bank in Indiana. In September 1949, he re-entered the federal service as Special Assistant, Loans and Finance, Navy Department. In 1956 came his employment as a loan officer with the Small Business Administration (SBA), a GS-15 excepted Schedule A position. He advanced to membership *336 on the Loan Review Board of the SBA, a GrS-16 excepted Schedule A position, and became chairman of that body. On September 1,1957, he was again promoted in the SBA to Director of the Office of Financial Assistance, an excepted Schedule C position[1] in grade GS-18, with a salary of $17,-500 per year.
As Director, plaintiff was responsible for administering the SBA’s financial assistance programs. His authority was delegated from his immediate superior, the Deputy Administrator (then Albert C. Kelly), who, in turn, received his powers from SBA Administrator Wendell B. Barnes. It was Mr. Kelly who recommended plaintiff for the position of Director; at that time, Mr. Kelly thought well of Mr. Keener’s abilities and qualifications; he considered plaintiff a valuable employee of the SBA and the two had a congenial personal relationship, professionally and socially. This good feeling, however, did not last long after Mr. Keener was promoted to Director. In the late summer (or early fall) of 1958 plaintiff became troubled by some of Mr. Kelly’s actions which plaintiff believed to be unjustified “meddling” into the affairs of his office. Orders were issued to, and there was consultation with, some of Mr. Keener’s subordinates without his knowledge; certain mail was rerouted around him ; two of his staff, whose transfer he was considering, were summarily transferred by Mr. Kelly (who wanted speedier action); plaintiff was sent on a trip to field offices with little prior notice. The once pleasant relationship between plaintiff and Mr. Kelly became quite strained.
On September 18, 1958, the SBA Administrator, Mr. Barnes, conferred with plaintiff and told him that, unless the difficulty with Mr. Kelly came to an end, plaintiff “would have to go.” The next day, plaintiff and Mr. Kelly discussed the problem and the subject of plaintiff’s resignation arose (though it is not clear who brought up the matter). There was no resolution of the problem, but plaintiff began to believe that his position was in jeopardy. In October 1958, his name was removed from a list of speakers to and participants in the Regional Directors Conference of SBA; also, during *337 October and November, he was not invited to be present at area conferences of SBA Financial Chiefs, a type of meeting he had customarily attended in the past.
Administrator Barnes, Deputy Administrator Kelly and plaintiff held a meeting on November 20, 1958, at which the latter was told that there would be a reorganization of the Office of Financial Assistance which entailed the abolishment of plaintiff’s grade 18 position. The Administrator had decided to divide the functions of the Office into a Loan Processing Section and a Loan Administration Section, with a grade 17 Director to head each part. This change was explained as necessary because of the alarmingly high rate of loan delinquencies. The loan administration function, as distinguished from the making of loans, had been given little emphasis at the SBA and it was thought that the proposed reorganization would improve the delinquency record. Mr. Keener took the reorganization to be, in reality, a means of firing him. Mr. Barnes denied that such was the case and stated that there would be other positions available within the agency and that, if plaintiff would be embarrassed in taking a reduction in grade, the Administrator would help him find a job elsewhere in government work or in the private area.
The next day, plaintiff received a letter from the Administrator stating that he, Mr. Barnes, had determined after “a careful study” that the Office of Financial Assistance would have “more efficient and economical operation” through a reorganization resulting in the abolishment of plaintiff’s GS-18 position; and that the separation would take effect December 31, 1958. The letter explained plaintiff’s rights of administrative appeal and that “all facilities of this Agency will furnish you every possible assistance in locating other employment.”[2] There was no mention, however, of the new grade 17 positions as being open to plaintiff, and in fact he was not considered for those posts. Plaintiff did not avail himself of the offer to relocate him, but filed an appeal with the Civil Service Commission. On April 16, 1959, the Appeals Examining Office of the Commission decided that, as a preference eligible, plaintiff “was entitled *338 to assignment to either of the established GrS-17 levels at the option of the agency and was entitled to compete for retention in the level at the time he was separated from the agency.” See finding 3. The SBA appealed to the Board of Appeals and Review, but the case was referred directly to the Commissioners who reversed the Appeals Examining Office. On November 24, 1959, plaintiff was informed that the Commission had ruled that his separation was a reduction-in-force action and “he was properly reached for action by reduction in force in the excepted position of Director, Office of Financial Assistance, GrS-18. In view of his excepted appointment, he was not entitled as a matter of right to an offer of position change in lieu of separation.” On May 25,1960, the petition was filed in this court.
Plaintiff’s major theme is that the Civil Service Commission’s final determination was arbitrary and capricious because the reorganization within the SBA had no other real purpose than his discharge. If that was so, he was not properly reduced in force under Section 12 of the Veterans Preference Act, 5 U.S.C. § 861, and the Commission’s regulations [3] which permit such a reduction only upon a valid reorganization (there being, admittedly, no other authorized ground for reduction present in his case).[4] Alternatively, if the alleged reorganization was only a veil for plaintiff’s summary discharge without any adequate reason personal to him, there would be a violation of Section 14 of the Veterans Preference Act, 5 U.S.C. § 863, requiring that a veteran’s dismissal be for “such cause as will promote the efficiency of the service”' — after notice, written charges, and a .chance to be heard. Cf. Knotts v. United States, 128 Ct. Cl. 489, 121 F. Supp. 630 (1954); Gadsden v. United States, *339 111 a. Cl. 487, 78 F. Supp. 126 (1948). See, also, Preble v. United States, 150 Ct. Cl. 39, 46 (1960). If, however, the reorganization was not a subterfuge, plaintiff cannot complain that his grade 18 position was abolished or that he could no longer hold it.
Was the reorganization instituted for the improper purpose plaintiff asserts or did it have a valid aim? After a trial, our Commissioner has found (finding 16) that Administrator Barnes was motivated by two reasons in ending plaintiff’s grade 18 position:
Primarily, he was genuinely concerned by the rising loan delinquency rate and, having a high personal regard for Kelly [plaintiff’s superior, the Deputy Administrator], he was willing to experiment with the latter’s recomendation that SBA’s Office of Financial Assistance be divided to coincide with the previous division of the field offices in the hope that such a change would be remedial [of the loan delinquency record]. Secondarily, he was aware of the strained relationship between Kelly and plaintiff, and the proposed reorganization, involving an abolishment of plaintiff’s job, provided a convenient vehicle for resolving that particular problem.
In other words, whatever personal reasons Mr. Kelly may have had for recommending this reorganization to Mr. Barnes, the Administrator’s decision, not impelled by any personal animus of his own, was made to improve a then serious defect in the operation of the SBA. If this change also had the added effect of relieving a problem in the relationship of plaintiff and Mr. Kelly, that was so much the better as far as Mr. Barnes was concerned.
The court adopts this conclusory finding both because it is adequately supported by the preponderance of the evidence and because plaintiff has not borne the special burden resting on an employee who charges that a managerial decision, fair on its face, was rendered for improper motives. Cf. Knotts v. United States, supra, 128 Ct. Cl. at 492, 121 F. Supp. at 631; Preble v. United States, supra, 150 Ct. Cl. at 46; Harrington v. United States, 161 Ct. Cl. 432. The record shows that its loan delinquency history had become a problem for the SBA, causing weighty concern to the Administrator. *340 When the agency was established, its efforts were primarily in the area of loan processing (i.e., the initial making of a loan) in order to build its loan portfolio and make use of the revolving fund Congress had provided for that purpose. After a few years, loan delinquencies and liquidations began to grow and the need for tailing some kind of remedial action arose. Prior to the time Mr. Kelly became Deputy Administrator (when he was serving in the Dallas field office), he originated the idea of dividing functions in the field offices so that loan administration (involved with loan liquidations and delinquencies) would have emphasis and consideration equal to that given loan processing. The Eeconstruction Finance Corporation, which made loans comparable to those of the SBA, had also worked on similar lines. Mr. Kelly’s idea was finally put into effect in all the SBA field offices. But after this separation of functions became operative and Mr. Kelly had been promoted to Deputy Administrator, the loan delinquency rate still continued to climb. By the fall of 1958, that rate had become alarming to both Mr. Kelly and Administrator Barnes. If delinquencies exceeded four or five percent of the loans, the ratio was considered excessive; a report of the SBA Comptroller prepared on November 5, 1958, showed that the figure was then approximately eight percent. It was around that time that Mr. Kelly began to believe that the Washington Office of Financial Assistance (of which plaintiff was Director) ought to be organized on the same divided basis as the regional offices. This was discussed with two other high officials of SBA (the Deputy Administrator for Administration and the Director of Personnel) who had no personal feeling against plaintiff. Then the proposal was taken to the Administrator, who discussed it with Mr. Kelly and the other two members of the SBA whom Mr. Kelly had seen earlier. After this meeting, Mr. Barnes decided to effect the reorganization. As we have said, plaintiff was told of this decision, which would affect his grade 18 position, on November 20, 1958. Thereafter, the reorganization was speedily put through and the functions which had been centralized in plaintiff’s former position were turned over to two heads of two separate offices *341 (each a grade 17, Schedule C, position). The Director of Personnel felt this to have resulted in an increase in organizational strength due to the equalization of the functions of loan processing and loan administration. The Washington Office, as well as the regional offices, have continued under this divided system; the position plaintiff held has not been reestablished.
We gather from the record that some agency action was clearly warranted to attempt to improve the loan-delinquency rate. Plaintiff has not denied this nor has he shown that this ratio was other than a serious problem to the SBA. Neither has plaintiff attempted to prove that the particular means chosen by the Administrator was transparently ineffective or unrelated to the evil to be cured. Reorganization (including the creation and abolition of jobs) as a means of improving the public’s business is peculiarly within the authority and discretion of agency heads and supervisory officials. Cf. Adams v. Humphrey, 232 F. 2d 40, 41 (C.A.D.C., 1955). Such rearrangements, as everyone who has lived in Washington knows, are a common remedy for the endemic ailments of federal agencies. In this case, too, although the Administrator was not untouched by plaintiff’s relationship with Mr. Kelly,[5] the moving factor, the basic concern, in Mr. Barnes’s mind was the grave objective problem of loan delinquency which was troubling his agency. That was the sine qua non. We do not believe that the possible “taint” of a lower-level purpose, which acknowledged that the reorganization would also relieve the subsidiary problem of a conflict between two subordinates, should invalidate the Administrator’s otherwise lawful decision. This secondary consideration was the sauce which spiced the roast but added little to its nourishment.[6]
*342 It follows that the abolition, of the grade 18 position was lawful and plaintiff is not entitled to recover for its loss.[7]
We turn, now, to the alternative contention that plaintiff should have been offered one of the newly created grade 17 positions pursuant to the Veterans Preference Act § 12, 5 U.S.C. § 861, and the implementing regulations which pertain to reductions in force. Defendant argues that the regulations for an employee in an excepted position do not grant the right to compete for retention on any level other than the one in which he is employed; there being no other grade 18 position in the SB A (after the abolition of plaintiff’s job) and no provision (defendant says) permitting plaintiff to compete at another level (unlike the situation for the non-excepted civil service), the agency was not obliged to offer plaintiff another post. Compare 5 C.F.B. § 20.5(c) (1958 Supp.) (excepted positions), with 5 C.F.B. §§20.5(a), (b) (1958 Supp.) (classified civil service). The parties’ opposing positions on this point raise substantial issues, perhaps bringing into question the validity under the Preference Act of reduction-in-force retention regulations which appear to distinguish between those in excepted positions and others in the civil service. But we need not, and do not, attempt to resolve this aspect of the controversy. As the defendant emphasizes, plaintiff has failed to show that he has suffered any damage due to the fact that he was not employed in. one *343 of the grade 17 slots. He obtained other suitable employment where he earned the equivalent (or more) of the salary of a GS-17. See finding 17. Even if he were improperly deprived of that salary, there would be no damages recoverable, and this court would be powerless to enter any judgment in his favor.[8]
Plaintiff’s petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Lloyd Fletcher, and the briefs and arguments of counsel, makes findings of fact as follow:
1. Prior to November 21, 1958, plaintiff, a citizen of the United States, was Director of the Office of Financial Assistance of SBA with the grade of GS-1160-18. His position was a Schedule C excepted position under Civil Service Begulations, and he held a retention sub-group classification of 1-A. As a veteran of World War II, plaintiff was entitled to the protection of Section 12 of the Veterans’ Preference Act of 1944, as amended. He had attained the status of a permanent Civil Service employee with veterans’ preference, and was fully qualified and had been so certified by the United States Civil Service Commission as a Loan Specialist and Administrative Officer in all grades from GS-12 to GS-18, inclusive.
2. On November 21, 1958, plaintiff received a letter from Wendell B. Barnes, Administrator of SBA, stating in part:
I have made a careful study of the organization of the Office of Financial Assistance and have determined that a more efficient and economical operation can be maintained through a reorganization of that office which will result in the abolishment of the position of Director, Office of Financial Assistance, GS-18. Accordingly, it *344 is necessary to terminate your services by reduction in force effective close of business December 31, 1958.
The letter went on to describe plaintiff’s annual and sick leave rights, the procedures for appealing the Administrator’s action to the U.S. Civil Service Commission, the help available through the Civil Service Commission in obtaining employment in other agencies, and concluded as follows:
All facilities of this Agency will furnish you every possible assistance in locating other employment.
I sincerely regret the necessity for this action and wish to thank you for the contributions you have made to our program.
Thereafter, on December 23, 1958, plaintiff filed an appeal to the Bureau of Departmental Operations, Appeals Examining Office, United States Civil Service Commission. On February 2, 1959, a hearing was held before a Civil Service Appeals Examiner, at which testimony was received and exhibits introduced on behalf of plaintiff. Although no witnesses appeared on behalf of SBA, it was represented at the hearing by Edwin Z. Holland, Director of Personnel, SBA, who stated the agency’s position and cross-examined the plaintiff’s witnesses. On April 16, 1959, a decision was rendered on plaintiff’s appeal by S. L. Elliott, Chief, Appeals Examining Office, Civil Service Commission.
3. In its decision of April 16, 1959, the Appeals Examining Office made the following findings of fact:
1. Mr. Keener’s position, Director, Office of Financial Assistance, GS-18, was abolished as the result of a reorganization in the Small Business Administration.
2. Mr. Keener is a preference eligible.
3. Major and identifiable portions of the former GS-18 position can be found in the newly established GS-17 positions of Director, Office of Loan Administration, and Director, Office ox Loan Processing.

*

In view of our findings above,we find that Mr. Keener was entitled to assignment to either of the established GS-17 levels at the option of the agency and was entitled to compete for retention in the level at the time he was separated from the agency.
*345 These rights were not granted to Mr. Keener; therefore, it is recommended that the records of the Small Business Administration be corrected to place Mr. Keener in either of the two GS-17 positions, retroactive to the day-following his removal.
»1: ‡ ‡ *
4. On April 22, 1959, SBA filed its notice of appeal from the above decision of the Appeals Examining Office and on May 14, 1959, filed its brief with the Board of Appeals and Review, United States Civil Service Commission. On August 17,1959, plaintiff filed his response thereto. The Board of Appeals and Review did not decide the appeal. On November 24, 1959, the Civil Service Commission, itself, sustained the appeal of SBA and reversed the decision of the Appeals Examining Office. Notification of the Commission’s action was forwarded to all interested parties on November 24, 1959, by the Chairman of the Board of Appeals and Review who stated, in pertinent part, as follows:
In view of the nature of the issues involved, the Board referred the appeal of the Small Business Administration to the Commissioners for decision. They have fully considered the entire appellate record including representations in behalf of the agency and representations in behalf of Mr. Keener. The decision reached by the Commissioners is that the separation of Mr. Keener was a reduction-in-force action within the meaning of the Retention Preference Regulations, and that he was properly reached for action by reduction in force in the excepted position of Director, Office of Financial Assistance, GS-18. In view of his excepted appointment, he was not entitled as a matter of right to an offer of position change in lieu of separation. Accordingly, the agency’s action resulting in Mr. Keener’s separation by reduction in force is sustained by the Commissioners.
The decision of the Commissioners sustains the appeal of the Small Business Administration, reverses the decision of the Appeals Examining Office and rescinds the recommendation for a change of records in Mr. Keener’s case.
5. At the present time, plaintiff is Vice President of Union Bank, Los Angeles, California, and is 54 years of age. He is a graduate of The George Washington University, (AB) ; National University, (LLB); and the American Institute of Banking. Plaintiff was a long-time career employee of the *346 Federal Government with, an extensive background in banking and finance, and defendant lias agreed that he was qualified for his position as Director of the Office of Financial Assistance.[9]
Having duly qualified in accordance with the rules and regulations of the United States Civil Service Commission, plaintiff first entered the employment of the United States as a civilian employee in October 1987 as an Assistant National Bank Examiner in the Office of the Comptroller of the Currency, Treasury Department, and was continually so employed until July 1942, when he received a commission as lieutenant in the United States Navy. He continued in the active service until he was honorably discharged to the Naval Eeserve in 1946 as a commander. Following the war he was employed as Assistant Vice President of the Mercantile National Bank of Chicago, Illinois, until he became Vice President of the National City Bank of Evansville, Indiana, which position he held until just before the outbreak of the ■Korean War. In September 1949, plaintiff re-entered Government service and served until April 1956, as Special Assistant, Loans and Finance, Department of Defense, Navy Department.
In April of 1956, plaintiff became a loan officer with SBA, an excepted Schedule A position with the grade of GS-15. Thereafter, plaintiff was promoted to grade GS-16, an excepted Schedule A position, when he became a member of the Loan Eeview Board of SBA. He subsequently became Chairman of the Loan Eeview Board. On September 1, 1957, he was promoted to Director of the Office of Financial Assistance, an excepted Schedule C position, where he held a grade of GS-1160-18, with a salary of $17,500 per year. In this position, plaintiff was directly under, and had immediate responsibility to, the Deputy Administrator for Financial Assistance. According to the SBA organizational chart, the *347 Deputy Administrator bad the ultimate responsibility for the coordination of all SBA financial assistance programs and directed the development of lending policies and programs. Plaintiff bore responsibility for directing and administering those policies and programs. Directly under him were the Loan Beview Board, the Special Programs Division, the Loan Servicing Division, and the Administrative Division. The authority which plaintiff possessed as Director, Office of Financial Assistance, was authority delegated from the SBA Administrator, Wendell B. Barnes, to the Deputy Administrator for Financial Assistance, and from the Deputy Administrator for Financial Assistance to plaintiff.
6. During the times involved herein, the SBA Deputy Administrator for Financial Assistance was Albert C. Kelly. He first commenced working for SBA in February 1956 as its Begional Director in Dallas, Texas. SBA Administrator Barnes had known Mr. Kelly and his immediate family for some years, and was responsible for the latter’s'appointment as a regional director. The Administrator felt that Kelly had done a very good job as Begional Director, and in the spring of 1957 Kelly was promoted to Director, Office of Financial Assistance. Shortly thereafter, he was still further promoted to Deputy Administrator for Financial Assistance. Kelly thereupon recommended that plaintiff be made his successor as Director, and on September 1,1957, plaintiff was so promoted.
7. Mr. Kelly considered plaintiff to be a valuable employee of SBA, and at the beginning of their acquaintance, the personal relationship between plaintiff and Mr. Kelly was a congenial one, both professionally and socially. However, commencing in the late summer or early fall of 1958, this pleasant relationship began to deteriorate into a somewhat strained one. During this time, plaintiff became quite disturbed over certain actions taken by Mr. Kelly which plaintiff considered to be unjustified, “meddling” in the affairs of plaintiff’s office. For example, on several occasions, he learned that Kelly had issued orders to, and consulted with, various subordinates of plaintiff without plaintiff’s knowl *348 edge; Congressional and other mail which plaintiff considered to fall within his area of responsibility was routed around plaintiff by Kelly to subordinate employees with less experience; at a time when plaintiff had a personnel transfer proposal under study, Kelly himself transferred the personnel involved, who were two of plaintiff’s subordinates, to SBA field offices because Kelly felt that quicker action was imperative.
Also, plaintiff resented that late on Friday afternoon, September 5,1958, without prior warning, Mr. Kelly ordered plaintiff by written memorandum to leave Washington on the following Sunday afternoon for a one-week trip to field offices in Des Moines, Salt Lake City, and Albuquerque, his assignment being to determine the best method of servicing loans in those areas. Mr. Kelly’s order reached plaintiff so late on Friday that plaintiff was unable to obtain advance travel money, although he did have, and was able to use, Government travel vouchers for his transportation costs. After plaintiff’s return, Mr. Kelly complained to plaintiff that he had made no recommendations covering the subject of his investigations on this trip. Plaintiff’s report to Mr. Kelly, dated September 12, 1958, did in fact contain some recommendations with respect to each of the three field offices. In a personal conference on September 19, 1958, an argument occurred between the two men. In their testimony at the trial, each man differed in his recollection of the exchange of words. They appeared to agree that plaintiff voiced his dissatisfaction over being by-passed and not being kept informed by Kelly. Plaintiff testified that Kelly stated he had lost confidence in plaintiff, that plaintiff should therefore resign and look for another job, and that if plaintiff “didn’t do it the easy way, he [Kelly] would do it the hard way.” On the other hand, Kelly testified that he did not ask plaintiff to resign; that he told plaintiff that Kelly’s bypassing of plaintiff and the Administrator’s by-passing of both of them was necessary to accommodate the agency’s tremendous workload; and that if plaintiff was unhappy or didn’t like his present environment, he could resign. Whichever recollection is correct, it is clear that the subject of plain *349 tiff’s resignation arose during the conference, and from that time forward plaintiff was convinced that his job was in jeopardy.
8. On the previous day, September 18, 1958, the Administrator also had talked to plaintiff and told him that the working relationship between Kelly and plaintiff left much to be desired and that the Administrator and Kelly had certain reservations about plaintiff. He told plaintiff that unless the relationship improved, plaintiff “would have to go.” The following week while Kelly and plaintiff were attending the American Bankers Association Convention in Chicago, Kelly suggested to plaintiff that he should use the opportunity to look around for another connection with the bankers present. On October 3, 1958, plaintiff conferred with the Deputy Administrator for Administration and the Director of Personnel. This interview was held at the request of the Administrator to find out what “is troubling John [plaintiff].” The discussion centered around the strained relationship between plaintiff and Kelly, and plaintiff was asked what he was going to do about it. Plaintiff said he didn’t propose to do anything about it. He did advise them that Kelly had asked him to resign.
9. Also, in October 1958, plaintiff’s name was removed from a list of speakers and participants in the Regional Directors Conference of SBA to be held that month in Washington. This removal action, which plaintiff attributed to Kelly, was embarrassing to plaintiff because it was customary for all SBA Directors, including himself, to participate in the Conference. Further, he was chagrined at not being invited to attend area conferences of SBA Financial Chiefs held during October and November in Kansas City, San Francisco, Atlanta, and New York, a type of conference which he had customarily attended in the past. The Administrator testified that these conferences varied in their program content from time to time and had the primary function of enabling him to communicate personally with the SBA Regional Directors so that the presence of plaintiff, or any other particular SBA officer, was unnecessary.
*350 10. On November 20,1958, plaintiff bad a conference with Administrator Barnes and Mr. Kelly. Tbe Administrator stated that be had decided to reorganize tbe Office of Financial Assistance by dividing it into two sections which would be thereafter referred to as tbe Loan Processing Section and tbe Loan Administration Section, respectively; that each section would be beaded by a grade 17 job; and that tbe grade 18 job which plaintiff held as Director of the Office of Financial Assistance would be abolished. The Administrator explained his feeling that the existing loan delinquency record made necessary the contemplated reorganization. Plaintiff protested that, in fact, he was being fired, but the Administrator denied that this was the purpose or intended result of the reorganization. Also, the Administrator reminded plaintiff that some of plaintiff’s prior actions were objectionable to the Administrator, but he stated that there would be other positions available to plaintiff within the agency and that plaintiff’s preferences would be taken into consideration. The Administrator further stated to plaintiff that, if he felt embarrassment at a reduction in grade, the Administrator would endeavor to help plaintiff find something elsewhere in the Government or even outside of the Government. Plowever, the Administrator advised plaintiff that the reorganization had been definitely decided upon and would be consummated as planned.
11. Prior to the date of the aforesaid conference on November 20, 1958, no one had ever mentioned to plaintiff a proposed reorganization of his office. In the Administrator’s letter to plaintiff dated November 21,1958, the Administrator referred to a “careful study of the organization of the Office of Financial Assistance.” (See finding 2, sufra.) Insofar as his office was concerned, plaintiff was not aware that any such study had been made. However, he was aware that commencing in the early part of 1957, reorganization studies had been instituted with respect to the field offices of SB A. He participated in these studies.
An idea for separating in the field offices the functions of loan processing and loan servicing or administration appears to have originated with Mr. Kelly while he was himself *351 serving in the Dallas field office.[10] Loan processing involves the initial making of the loan, whereas loan administration involves the servicing of the loan until it is paid off or liquidated. In the early days of SBA’s existence, the emphasis had been placed on loan processing to build the loan portfolio and to use the revolving fund Congress had provided for that purpose. However, after a few years of operation, when the loan portfolio had been built up, liquidations started and delinquencies increased. SBA operates in a marginal lending area and an unusual amount of loan administration, servicing, and counseling is required. With the growth of the number of loans handled by SBA and with the increasing delinquency rate, by the spring of 1957, the SBA Administrator felt that it was important to put more emphasis on loan servicing and administration. He instructed Mr. Kelly to develop a more vigorous, competent, and efficient system of loan administration.
In May 1957, Kelly prepared and circulated throughout the agency certain instructions designed to place more emphasis on loan administration. These instructions directed that Loan Administration Sections be established in each Regional Office, and stated:
Except for the very largest Regional Offices, SBA has not had separate loan administration sections, with attendant delineation of responsibilities. The ever-increasing workload imposed upon the individual loan examiners charged with loan administration duties makes it imperative that we establish at once a separate loan administration section in each Regional Office. With this change, it is also important that we improve our collection methods and techniques. Heretofore, the Regional Offices have been so meagerly staffed for loan administration purposes that most of our work in loan administration has been curative in nature rather than preventive. The prime significance of this directed *352 change will be a shift to preventive action — to the heading off of trouble before it has a chance to begin.
The changes contained in Kelly’s May 1957 instructions were ultimately finalized and incorporated in the SBA Operations Manual by TN 500-72, dated December 2, 1957, which was prepared by or under the supervision of plaintiff after he became Director, Office of Financial Assistance. By early 1958, separate sections to handle loan administration had been established and were operating in the regional offices. This reorganization in the regional offices resulted in no reductions in force, but required an increase in personnel.
12. In February of 1958, Kelly was still concerned about loan administration and was interested in further strengthening the responsibility for loan administration. In his six months’ progress report to the SBA Administrator, dated February 21,1958, Kelly stated:
FA [Financial Assistance] has gotten into operation its Loan Administration Divisions in each of the Regional Offices. Many of these Loan Administration Divisions have much maturing yet to do. It is recognized that these probably should have been initiated at least a year ago rather than six months ago. With the general tightening of business conditions and the consequent rise in delinquencies and loans in liquidation, these new Loan Administration Divisions have labored under a shock load of work for which they were none too well prepared. However,, their present travail will, in my opinion, be their making if we can continue to provide close supervision from Washington. Our primary emphasis has shifted from the making of loans to the servicing of loans. We have yet to make the Field Offices fully cognizant of the superior financial counseling job which is necessary in the loan administration function.
These steps to establish loan processing and loan administration as separate functions in the field were fully operative by the middle of 1958, but the loan delinquency rate was still rising. The Regional Offices by that time were organized with the Regional Director as the field counterpart of the SBA Administrator and with the Chief Financial Specialist as the field counterpart of the Deputy Administrator for Financial Assistance. In the Regional Offices, the *353 Regional Director and the Chief Financial Specialist directly supervised the loan administration sections and the loan processing sections. These measures did not resolve the problem of increasing loan delinquencies.
13. SBA’s administration problems, particularly in the field of loan servicing and collection, had already been substantially increased in early 1958 by its acquisition from the Treasury Department of a large part of the business and disaster loan portfolio left by the defunct Reconstruction Finance Corporation. Then, in July 1958, Congress passed the Small Business Investment Act and assigned the administration thereof to SBA. This new legislation stimulated more interest in the business world than had been anticipated, and it had a tremendous impact on SBA’s already heavy workload. Kelly was designated Acting Administrator of the new Small Business Investment Division in addition to his duties as Deputy Administrator for Financial Assistance. As a result, plaintiff was required to take over many of the command decisions for SBA’s entire financial assistance program.
However, Kelly still remained responsible for the Office of Financial Assistance, and he continued to be concerned about the loan administration problem. By the fall of 1958, the delinquency rate had become alarming to Kelly and to the Administrator, who felt that it was a matter of concern if the delinquency figure exceeded four or five percent. At the budget hearings[11] in the fall of 1958, questions were raised about the increased delinquency rate, and thereafter the SBA Comptroller compiled figures which showed a loan delinquency rate of around eight percent. That report, prepared on November 5, 1958, was transmitted to Kelly by memorandum dated November 10,1958.
Shortly thereafter, Kelly decided that since the loan delinquency problem had not been solved by the administrative steps already taken, the Washington Office of Financial Assistance should be organized in the same way that the *354 regional offices had already been organized, that is, by separating the functions of loan administration and loan processing into two separate sections, giving equal dignity to each. He then discussed the matter with the Deputy Administrator for Administration and the Director of Personnel following which he recommended to the Administrator that the reorganization be made. After discussing the matter with Kelly, the Deputy Administrator, and the Director of Personnel, the Administrator made the decision to reorganize the Office of Financial Assistance and to abolish the position of Director held by plaintiff. Plaintiff was not called into these conferences, nor was the matter discussed with him until his conference with the Administrator and Kelly on November 20,1958, as related in finding 10, sufra.
14. On November 21, 1958, the late Congressman Carroll Reece[12] of Tennessee, who was a long time friend of plaintiff and his family, conferred with Administrator Barnes about plaintiff’s situation. The Congressman testified that during the course of the discussion, Mr. Barnes enumerated a great nmnber of shortcomings on the part of plaintiff,[13] and then stated that plaintiff’s position was to be abolished in a reorganization of the agency. Mr. Barnes informed Congressman Reece that he had great confidence in Deputy Administrator Kelly. Since there was a conflict between plaintiff and Kelly, the Administrator stated that he would have to stand behind Mr. Kelly. Although the Administrator further stated that the planned reorganization was intended to accomplish better results in the agency, it was Congressman Reece’s impression that plaintiff’s services were deemed unsatisfactory, and that the purpose of the reorganization was to remove plaintiff from his position.
Also, shortly after the removal notice of November 21, plaintiff’s attorney contacted the Administrator by telephone *355 to discuss the matter. He was informed by the Administrator that plaintiff had various faults and had been warned several times. They discussed whether a specific job was available in SBA for plaintiff. No specific job was mentioned, but the Administrator told the attorney that he had no animosity towards plaintiff, who was honest and had done a good job in his area, and the Administrator felt there was a position that could be found for plaintiff either inside or outside of Government. The Administrator stated he was willing to assist plaintiff in this respect unless plaintiff persisted in his opposition or appealed the Administrator’s action to the Civil Service Commission.
About this same time in November 1958, the Administrator offered former Congressman Henry Talle a job in SBA at a salary of $17,500 per annum. Tire only position in SBA ait that time with such a salary was the one held by plaintiff. Mr. Talle, who had been senior Eepublican on the House Banking and Currency Committee, had been defeated in the 1958 elections. At the trial the Administrator, at first, could not recall this matter. However, on further questioning, he did remember making the offer but thought it was for a job in another division of SBA which Mr. Talle rejected.
15. On December 1, 1958, the Administrator issued a memorandum notifying the Washington Office Directors and all Eegional Directors of the reorganization. SBA did not obtain prior approval of this reorganization from the Civil Service Commission. SBA notified the Civil Service Commission of its reorganization action sometime in January 1959. Pursuant to request of the SBA Administrator, the Civil Service Commission certified the two new position descriptions of Director, Office of Loan Administration, and Director, Office of Loan Processing, on February 6, 1959.
These two new positions were established at grade GS-17, and they were responsible directly to the Deputy Administrator for Financial Assistance. The functions of loan processing and loan administration were clearly separated between the new positions. Before the reorganization, the Office of Financial Assistance, directed by plaintiff, had combined the two functions in generalized terms with emphasis *356 on loan processing.[14] After the reorganization the two functions were spelled out in more detail with equal emphasis and responsibility given to each.[15] Although no new functions were added to, or subtracted from, the SBA as an organization, according to the Director of Personnel there resulted an increase in “organizational strength” due to an equalization of the two functions.
As of the date of the trial hereof, the position of Director of the Office of Financial Assistance had not been re-established by SBA, and the reorganization, as described above, has remained in effect.
16. The record in this case establishes that the SBA Administrator was motivated by two considerations in ordering *357 the reorganization above described. Primarily, he was genuinely concerned by the rising loan delinquency rate and, having a high personal regard for Kelly, he was willing to experiment with the latter’s recommendation that SBA’s Office of Financial Assistance be divided to coincide with the previous division of the field offices in the hope that such a change would be remedial. Secondarily, he was aware of the strained relationship between Kelly and plaintiff, and the proposed reorganization, involving an abolishment of plaintiff’s job, provided a convenient vehicle for resolving that particular problem.
17. Had plaintiff remained in his GS-18 position in the Small Business Administration in 1959, he would have earned the sum of $17,500. Had plaintiff been given one of the two GS-17 positions, he would have, under the policy of the Small Business Administration, been placed at the top of that grade and would have earned $16,335 in 1959. Plaintiff’s gross income for the calendar years 1959, 1960, and 1961 was $16,951.87, $17,026.80, and $16,605.73, respectively.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

 Schedule C is for certain confidential or policy-making positions excluded from the competitive civil service.

 The relevant portions of the letter are set forth in finding 2.

 The pertinent regulation, 5 C.F.R. § 20.2(a) (1958 Supp.), provides:
“* * * ‘Reduction in force’ is the release of an employee from a competitive level by means of separation from the rolls, furlough for more than thirty (30) days, reassignment involving displacement, or change to lower grade; when such actions are caused by lack of work, shortage of funds, reorganization, or exercise of regulatory reassignment or reemployment rights.” This regulation, as well as its predecessor, applied to reductions in force occasioned by a reorganization. Harris v. United States, 153 Ct. Cl. 425, 431-32 (1961).

 In Ritter v. Strauss, 261 F. 2d 767 (C.A.D.C., 1958), it was held that a reduction in force was invalid when it was not made for one of the reasons set forth in the applicable regulations (5 C.F.R. § 20.2(a), set forth in footnote 3, swpra).

 As the findings show, the record is not empty of pieces of evidence tending to show that even Mr. Barnes was thinking, to some extent, of the advantages of plaintiff’s separation from the agency. But the record as a whole does not show that this was the Administrator’s primary goal or that he would have taken the action he did in the absence of a belief that division of the loan functions should be tried as one method of solving the delinquency problem.

 Plaintiff cites a number of state decisions invalidating efforts by states or municipalities to remove employees by abolishing their jobs. In each of those cases, the court found no adequate reason for the change but simply an improper desire to oust the particular official.

 The claim has also been made that the reorganization did not comply with a regulation set forth in the Federal Personnel Manual, Chapter S-2, TS 536, May 4, 1956, which reads in pertinent part: “* * * Schedule C authorities are applicable only to the specific position for which they are approved by the Commission. When an agency changes the duties of a position, its organizational location, or its reporting relationships, the appointing officer may not take it for granted that the newly described position is covered by the earlier Schedule C authority. Prior approval should, in such cases, be requested in writing and secured before the Schedule C authority is used for the revised or new position * *
Plaintiff says the reorganization was defective because the Schedule C positions of Director, Office of Loan Administration, and Director, Office of Loan Processing — the two new grade 17 posts — were not approved by the Commission until February 6, 1959, while the separation of plaintiff, and the reorganization, occurred a month or so prior to that time, under our view of the regulation, it does not require prior approval of a reorganization, but merely approval of the creation of a new Schedule C position. Failure to obtain approval pursuant to the regulation would have meant that perhaps the newly created positions fell under some category of the classified civil service other than the excepted status of Schedule C; it would have no effect on the validity of the reorganization itself.

 At the oral argument and afterwards, plaintiff attempted to show that, in fact, he had not had sufficient outside earnings in 1959 to offset the salary he would have earned at grade 17 in that year. This effort came too late. Plaintiff did not except to the Commissioner’s finding, nor did he make proper proof at the trial of the facts he now asserts. Particularly in view of defendant’s heavy reliance in brief and argument on plaintiff’s lack of standing to urge a decision on his right to the grade 17 position, we hold that plaintiff cannot now seek for the first time to amend the proof and findings. Cf. Stein Bros. Mfg. Co. v. United States, 162 Ct. Cl. 802.

 Prior to Ms removal from Ms position at SBA, plaintiff Rad served over 18 years in Government service during which time Re Rad never received a performance rating less tRan “satisfactory.” In June 1958 Re was selected by the Administrator of SBA as one of two men from tRat agency to attend the Conference Program for Executives in tRe Federal Service, conducted by The Broohings Institution at Williamsburg, Virginia. This program was designed to Relp senior career officials achieve a better understanding of their roles and responsibilities in Government and to enlarge their abilities to meet effectively the challenges and opportunities of their positions.

 There was precedent for it, however. SBA’s predecessor organization, the Reconstruction Finance Corporation, had a clearcut delineation between the two functions, and a majority of long-term lenders, such as insurance companies, also have maintained such a division between these functions. One traditional reason for the separation is the difference in temperament required of personnel engaged in such work. The person who recommends the making of the loan in the first place is not confronted with, and need not have the temperament for, the sometimes harsh and persistent approach required of the person who must later collect it.

 The SBA budget estimates for the fiscal year 1960, -which, were sent to the Bureau of the Budget in October 1958, included plaintiff’s position as Director of the Office of Financial Assistance in grade GS-18 through 1960. The estimates also indicated that loans would increase substantially and that the Office of Financial Assistance was understaffed and required increases in its personnel.

 Congressman Eeece died prior to the trial herein. However, he had testified in the administrative hearing before the Examiner of the Civil Service Commission, and his testimony there was admitted herein, without objection, under the prior testimony rule.

 The record does not indicate the nature of these “shortcomings” except for a complaint by the Administrator that plaintiff had once been late for a regional conference in Atlanta, which incident the Administrator said had embarrassed the SBA.

 The functions of that Office were described, as follows:
Directs and administers policies and programs for financial assistance to small business. Works with private financial and State institutions to enable small business to achieve more self-sufficiency. Acts as liaison with government agencies responsible for financing and credit policy. Approves or declines loan actions and issues notices of such actions. Determines eligibility of loan applicants on the basis of established criteria and previous rulings, and advises Regional Offices on eligibility status. Directs the preparation of instructional manuals and reports. Provides technical direction and coordination to the field offices in the administration and operation of the financial assistance program.

 The functions of the two new Offices were described as follows :
OFFICE OF LOAN ADMINISTRATION
Directs and administers policies and programs pertaining to the administration and servicing of SBA loans, including problem and delinqent loans, loans in liquidation, and the sale or disposal of acquired assets. Participates with the Office of the General Counsel and other SBA offices in the handling of problem and delinquent loans. Approves or declines amendments or modifications to loan authorizations for loans fully disbursed. Provides technical direction and coordination to the field offices in the administration and operation of the loan administration and related programs. Recommends new or revised policies and procedures for the administration and collection of loans. Maintains contact with banks, insurance companies and other financial institutions to develop a market for SBA loans, mortgages, securities, real estate and other assets. Participates in the development of training programs covering loan servicing and administration functions for Washington and field offices.
OFFICE OF LOAN PROCESSING
Directs and administers policies and programs pertaining to the processing of loan applications, both business and disaster loans, new or special financial assistance programs, and COC credit analysis. Administers the program pertaining to Fish and Wildlife loans, and coordinates such activity with Department of the Interior. Works with private financial and State institutions to enable small business to achieve more self-sufficiency. Acts as liaison with government agencies responsible for financing and credit policy. Approves or declines loan application actions and amendments or modifications to authorizations for undisbursed or partially disbursed loans. Provides technical direction and coordination to the field offices in the administration and operation of the Loan Processing and related programs. Determines eligibility of loan applicants on the basis of established criteria and previous rulings. Recommends new and revised practices and procedures relating to the making of business and disaster loans. Provides technical direction and coordination to the field offices in the administration and operation of the Loan Processing and related programs. Conducts research and recommends special material for reports, booklets, pamphlets and publications describing various loan programs. Participates In the development of training programs covering loan application processing functions for Washington and field offices.