Paul HONDROS, James Martin Duross and Nathan Smith, Prior Deputy United States Marshals for the Eastern District of Penna.

v.

UNITED STATES CIVIL SERVICE COMMISSION and United States Civil Service Commissioners, Robert E. Hampton, Chairman, Jane B. Spain, Vice Chairman, Ludwig J. Andolsek, Commissioner and United States Marshals Service, Wayne B. Colburn, Director, Reis R. Kash, Associate Director, Donald D. Hill, Associate Director, John W. Cameron, Associate Director.

Appeal of UNITED STATES MARSHALS SERVICE.

No. 82–1334.

United States Court of Appeals, Third Circuit.

Argued Jan. 24, 1983.

Decided Oct. 13, 1983.

Freddi Lipstein (argued), William Kanter, Civil Div. Dept. of Justice, Washington, D.C., Howard M. Goldsmith, L. Bruce Hoffman (argued), Goldsmith & Hoffman, Philadelphia, Pa., for appellees.

Gary Tilles, Asst. U.S. Atty., Philadelphia, Pa., for appellant.

Before SEITZ, Chief Judge, and ADAMS and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

The United States appeals from an order of the district court entered on March 25, 1982, directing the United States Marshals Service to reinstate Nathan Smith to the remainder of Smith's term position as a deputy United States Marshal, and to appoint Smith to a career position as a United States Marshal "at that level and grade he would be entitled to had he been appointed to the position of career deputy United States Marshal in 1973 and had served continuously until today." For the reasons discussed below, we affirm the order of the district court in part and reverse in part.

### I.

### A.

An overview of those regulations governing the hiring of civil service employees is necessary for our disposition of this appeal. Civil service employees are members of either the "competitive service"[1] or the "ex-

---

[1.] *See* 5 U.S.C. § 2102(a)(1) (Supp. V 1981):

(a) The "competitive service" consists of—

(1) all civil service positions in the executive branch, except—

cepted service."[2] An employee typically becomes a member of the "competitive service" by taking an examination administered by the Office of Personnel Management ("OPM"). *See* 5 U.S.C. § 3304 (1976 & Supp. V 1981). An applicant who meets the minimum requirements for entrance to an examination, and who receives a rating of 70 or more on the examination, is known as an "eligible." 5 C.F.R. §§ 210.102(b)(5), 337.101(a) (1983). OPM is required to enter on a civil service "register"[3] the names of all eligibles in accordance with their numerical rankings. 5 C.F.R. § 332.401 (1983).

An agency seeking to hire an employee must submit a request to OPM for a "certificate" of eligibles.[4] When OPM receives a request for certification of eligibles, it prepares a certificate by selecting names from the head of the appropriate register. This certificate consists of a sufficient number of names to permit the agency to consider three eligibles for each vacancy, 5 C.F.R. § 332.402 (1983), the so-called "rule-of-three."[5] A hiring official from the agency, known as the "appointing officer," 5 C.F.R. § 210.102(b)(1) (1983), is obliged to fill each vacancy "with sole regard to merit and fitness" from the three eligibles ranking highest on the certificate who are available for appointment. 5 C.F.R. § 332.404 (1983).

With a few exceptions not here relevant, eligibles appointed from a register become "career-conditional" employees. 5 C.F.R. § 315.301(a) (1983). These career-conditional employees may become "career" employees upon the completion of a three-year period of "creditable service." 5 C.F.R. § 315.201(a)(b) (1983).[6] Those employees who successfully complete the first year of the three-year service period generally have greater procedural rights than those who do not. For example, prior to the completion of the first year of a career-conditional employee's service period—the "probationary period"—the employee may be dismissed "if he fails to demonstrate fully his qualifications for continued employment." 5 C.F.R. § 315.803 (1983). During this period such an employee is accorded limited procedural rights,[7] and may seek review of a dismissal only on the grounds that the dismissal was discriminatory or effected by improper procedures.[8] Career employees

---

(A) positions which are specifically excepted from the competitive service by or under statute; ...
*See also* 5 C.F.R. § 212.101 (1983).

2. *See* 5 U.S.C. § 2103(a) (Supp. V 1981):
(a) For the purpose of this title, the "excepted service" consists of those civil service positions which are not in the competitive service....
*See also* 5 C.F.R. § 213.101 (1983).

3. A "register" is defined as a "list of qualified applicants compiled in order of relative standing for certification." 5 C.F.R. § 210.-102(b)(14) (1983).

4. A "certificate" is defined as a "list of eligibles from a register submitted to an appointing officer so that he may consider the eligibles for appointment." 5 C.F.R. § 332.102(a) (1983).

5. *See* Scalia, *The ALJ Fiasco—a Reprise*, 47 U.Chi.L.Rev. 57, 60 & n. 18 (1979).

6. Several exceptions permit appointees to bypass the period of creditable service and proceed directly to the status of career employee. *See* 5 C.F.R. § 315.201(c) (1983).

7. A probationer terminated "because of work performance or conduct during [the probation-

ary] period" is entitled only to a notice in writing "consisting of the agency's conclusions as to the inadequacies of his performance or conduct." 5 C.F.R. § 315.804 (1983).
A probationer terminated for conditions arising before appointment, in contrast, is entitled "to an advance written notice stating the reasons, specifically and in detail, for the proposed action," and "to a reasonable time for filing a written answer" supported by affidavit, which the agency "shall consider ... in reaching its decision." 5 C.F.R. § 315.805 (1983).

8. An employee terminated under sections 315.-804 or 315.805, *see* note 7 *supra,* may seek review of the agency's decision with the Merit Systems Protection Board. The Board's review is "confined to the issues stated in paragraphs (b) and (c) below:
(b) *On discrimination.* An employee may appeal under this paragraph a termination not required by statute which he or she alleges was based on partisan political reasons or marital status.
(c) *On improper procedure.* A probationer whose termination is subject to § 315.805 may appeal on the ground that his termination was not effected in accordance with the procedural requirements of that section.
5 C.F.R. § 315.806 (1983).

(and career-conditional employees in their second or third years of service), in contrast, enjoy the much greater procedural protections of the Lloyd-LaFollette Act.[9] *See generally Sampson v. Murray,* 415 U.S. 61, 80–82, 94 S.Ct. 937, 948–949, 39 L.Ed.2d 166 (1974).

Members of the "excepted service" are subject to less rigorous entrance requirements, and are accorded fewer procedural protections, than are members of the competitive service. Among the members of the excepted service are employees appointed for a definite term of employment, or "term employees." These employees do not acquire competitive status by virtue of their term appointment.[10] Term employees may be appointed for terms of one to four years "when the needs of the service so require." 5 C.F.R. § 316.301 (1983). Unlike members of the competitive service, who must generally submit to competitive examinations, term employees may bypass the rigors of the competitive process if OPM so authorizes. 5 C.F.R. § 316.302(b) (1983).[11] Term employees, on the other hand, are accorded none of the procedural protections of the Lloyd-LaFollette Act,[12] and only limited procedural rights by regulation.[13]

In general, there are no provisions for the conversion of term employees to career-conditional employees.[14] A term employee who wishes to acquire competitive status must therefore make use of the ordinary procedures for entering the competitive service. Those procedures include taking a competitive examination, obtaining a position on a civil service register, being certified as one of the three highest rated applicants for each vacancy, and being selected by an appointing officer with sole regard to merit and fitness." *See* p. 281 *supra.*

Both term and competitive employees may be released from employment when a shortage of funds, reorganization, or reclassification so requires.[15] The procedures

---

**9.** Lloyd-LaFollette Act, ch. 389, § 7, 37 Stat. 539, 555 (1912), as amended by the Back Pay Act, ch. 447, § 6, 62 Stat. 354, 355 (1948) (codified as amended at 5 U.S.C. §§ 5595–96, 7501 (1976 & Supp. V 1981)). These provisions are implemented by 5 C.F.R. § 752 (1983).

**10.** *See* 5 C.F.R. § 316.303(a) (1983) ("[a] term employee does not acquire a competitive status on the basis of his term appointment").

**11.** 5 C.F.R. § 316.302(b) (1983) provides:

The office may authorize an agency to make term appointments outside a register when there are insufficient eligibles on the appropriate register.

OPM may also authorize temporary appointments for less than one year, or "temporary limited appointments." *See* 5 C.F.R. §§ 316.-401–402 (1983).

**12.** *See* 5 U.S.C. § 7501(1) (Supp. V 1981) (defining "employee" as an individual "in the competitive service…").

**13.** Term employees, like career-conditional employees, serve a probationary period known as a "trial period." 5 C.F.R. § 316.304(a) (1983). Term employees during the trial period are accorded the same procedural rights as career-conditional employees during the period of probation. 5 C.F.R. § 316.304(b) (1983); *see* notes 7 and 8 *supra.* The procedural rights of term employees *after* the trial period are apparently not defined by regulation. By implication, however, term employees who have completed the trial period would have no fewer procedural rights than term employees during the trial period. Nevertheless, several courts have ignored the language of 5 C.F.R. § 316.304(b) and suggested, in dicta, that all employees in the excepted service "may be terminated at any time, without either a statement of reasons for discharge or adverse action appeal rights." *Fowler v. United States,* 633 F.2d 1258, 1263 (8th Cir.1980); *Paige v. Harris,* 584 F.2d 178, 181 (7th Cir.1978).

**14.** The provisions for conversion of employees to career or career-conditional employment are contained in 5 C.F.R. § 315 subpart G (1983). Section 315.703(a) of subpart G permits the conversion of employees whose names were once included on a certificate and who have been continuously employed since that time. For the reasons discussed below, section 315.-703(a) is not available to Smith in these proceedings.

**15.** Employees in the competitive service are ranked in "tenure groups" based on their length and type of service. 5 C.F.R. § 351.501 (1983). Employees in the excepted service are placed in similar tenure groups by each agency. 5 C.F.R. § 351.502 (1983). The conditions under which an employee may be released under these rules are limited to releases required:

because of lack of work, shortage of funds, reorganization, reclassification, due to change in duties, or the exercise of reemployment rights or restoration rights.

governing these releases are captioned "Reduction in Force," *see* 5 C.F.R. Part 351 (1983), and employees released pursuant to these procedures are said to be "RIF'd." An employee who is properly "RIF'd" does not enjoy a number of the procedural protections of the Lloyd-LaFollette Act. *See* 5 U.S.C. § 7512(B) (1976); 5 C.F.R. § 752.-401(c) (1983); *Rasmussen v. United States,* 543 F.2d 134, 137, 211 Ct.Cl. 260 (1976).

With this understanding of the governing Civil Service regulations, we turn to the facts giving rise to this appeal.

### B.

Nathan Smith was hired in August of 1971 as a term employee of the United States Marshals Service (the "Service"), an arm of the Department of Justice. The Marshals Service administered an "Anti-Air Piracy Program" in the early 1970s for the purpose of combatting a rising number of aircraft hijackings. Marshals for the Air Piracy Program were hired, pursuant to 5 C.F.R. § 316.302(b) (1983), as term deputies without regard for Civil Service Commission registers. *See* note 11 *supra.* Smith, who was not at that time on a Civil Service register, was hired for a term ending June 30, 1982 "subject to a character investigation."

The record indicates that at the time Smith was hired, agents of the Marshals Service represented that the Service intended to "convert" term deputies hired for the Air Piracy Program to career positions.

According to Gerald LaRosa, deputy marshal with responsibility for the Philadelphia airport, both the Philadelphia marshals and responsible officials in Washington "were under the understanding that [term deputies] were all going to be assumed into the Marshal[s] Service."[16] The Agency made these representations for the purpose of attracting more highly qualified candidates than would otherwise have applied for term positions. John Doyle, at the time one of four "specialists" in the United States for the Marshals Service, explained the Marshals' dilemma as follows:

> We were having trouble getting good employees because it was a temporary position to work in this program.... And the people that we wanted to hire in a lot of cases they didn't want to stay because ... it was only a temporary thing[.] [S]o they told them in Washington, they told the Marshal[s] to tell them that they would be converted to a permanent basis. I know because ... they would constantly call me on the phone in Washington and ask me when they were going to be converted because we were promising they were going to be converted.[17]

Accordingly, Nicholas Vinci, Chief Deputy Marshal in Philadelphia, explained to each term deputy, including Smith, that the Service intended to confer permanent status on term deputies provided that they completed the requisite one-year period of probation.[18]

In fact, however, the applicable Civil Service regulations did not permit the Service

---

5 C.F.R. § 351.201(a) (1983). A "RIF" may not be used as a ruse for dismissing employees for other reasons. *See Keener v. United States,* 165 Ct.Cl. 334, 338 (1964); *Ritter v. Strauss,* 261 F.2d 767, 771 (D.C.Cir.1958).

**16.** La Rosa testified as follows:

"[W]e were under the understanding that they were all going to be assumed into the Marshal[s] Service....

Q: When you say we, who do you mean by we?

La Rosa: Everybody that worked in the office, everybody that had anything to do with Washington. I have talked to [Jack Doyle and Jack Brophy, officials responsible for the Air Piracy Program] and they told me the same thing."

Tr. at 617–18.

**17.** Tr. at 639. Doyle testified that he asked Jim Berryhill, then the Service's Acting Personnel Officer, "when are we going to convert these people[?]" According to Doyle, Berryhill responded, "[J]ust tell them they're going to be converted." Tr. at 640–41.

**18.** Smith testified that Vinci and Marshal Charles Guy, "promised me that after a year's probation I would be converted to career deputy United States Marshal[.]" Tr. at 126. At least four term deputies confirmed Smith's account. *See* Tr. at 327, 332 (testimony of James Duross); Tr. at 466 (testimony of Allen Cox); Tr. at 492–93 (testimony of Anthony Pasquarella); Tr. at 507–08 (testimony of Paul Hondros).

to "convert" term deputies to permanent positions. *See* pp. 282–283 & note 14 *supra.* The regulations required, and members of the Marshals Service understood, that any term deputy seeking a permanent position had to make use of the ordinary procedures for entering the competitive service. Consequently, on June 16, 1972, Bert Lederer, then Personnel Officer for the Marshals Service, directed all hiring officials to employ the regular Civil Service Registers in order to "convert" term deputies. Lederer's communique provided:

BEGIN [THE] PROCESS OF CONVERTING TERM DEPUTIES TO CAREER CONDITIONAL APPOINTMENTS THROUGH CIVIL SERVICE REGISTERS. SUGGEST YOU MEET WITH LOCAL AREA OFFICE OF [THE CIVIL SERVICE COMMISSION] AND ENLIST ADVICE AND GUIDANCE.... EXPLAIN THAT YOU ARE TRYING TO CONVERT YOUR TERM DEPUTIES.[19]

The Service had, however, overlooked an important obstacle to its plan to "convert" term deputies that impeded its ability to convert Smith. A number of its term deputies, including Smith, were not on Civil Service Registers at the time of Lederer's announcement. Moreover, the appropriate Philadelphia register had closed on March 9, 1971, rendering it impossible for term deputies who had applied for employment after March 9 to obtain a position on a register. The Civil Service Commission did not correct this defect until September 20, 1972, when the Commission amended its examination announcement and accepted applications for the Philadelphia register until October 11.

19. Tr. 803, Appellant's Exh. 25.

20. Tr. at 753, 757. The FBI report is punctuated with uncorroborated hearsay and innuendo. One person interviewed by the FBI opined that Smith "is a 'brazen opportunist, who would beat you out of bill if he could.' " Tr. at 755. A second person considered Smith a "dishonest cop who would take anything that wasn't nailed down," and reported that "the word through the 'grapevine' was that [Smith] had

Between August of 1971, when Smith was hired, and September of 1972, when the Commission reopened the Philadelphia register, the Service obtained a character report on Smith compiled by the Federal Bureau of Investigation. This FBI report revealed that Smith had received four reprimands by the Philadelphia Police Force, where he had served with some distinction for 27 years. According to the FBI, Smith "received 'Outstanding' performance rating and numerous commendations from within and outside the [Philadelphia Police Department] from 1955 to 1968." Tr. at 757. The report also indicated, however, that Smith had been charged with "Conduct Unbecoming an Officer" in 1969 arising from an indictment for the sale of a stolen automobile, that Smith had "resigned under these charges," and that he had been found not guilty of all charges on June 26, 1970.[20]

On January 5, 1972, James Berryhill, then Acting Personnel Chief for the Marshals Service, drafted a letter proposing Smith's removal. Berryhill's letter recited that Smith had received four reprimands while serving on the Philadelphia Police Force, had been charged with "Conduct Unbecoming an Officer," and had "resigned while these charges were still pending." Berryhill directed that Smith's immediate superior, Marshal Charles Guy, sign this letter and present it to Smith. Although the record reveals that Marshal Guy staunchly supported Smith's competence as a marshal—and indeed that Guy drafted a letter to Wayne Colburn, Director of the Marshals Service, protesting Berryhill's instruction and asserting that Smith, "since being in my employ, has done an outstanding job and I am not convinced otherwise," Tr. at 786—Guy dutifully signed Berryhill's letter and passed it on to Smith.

sold a stolen automobile to a young, unsuspecting patrolman in his own squad." Tr. at 756. At other times, the opinions of Smith's acquaintances were laudatory. The Chief Security Officer of the Philadelphia Board of Education, for example, "considered [Smith] to be an excellent policeman and was very satisfied with [Smith's] work while with the Board of Education Security Office." Tr. at 754–55.

Smith responded in writing to Berryhill's proposed removal on January 19, 1972, in accordance with the procedural provisions governing the dismissal of term employees during the "trial period." *See* notes 7 and 13 *supra.* Because of the importance of the FBI report to this appeal, we review Smith's response to it in some detail.

The first two reprimands identified by the FBI, Smith stated, were:

due to my failure to notify a Detective assigned to my division that he was to appear in Court. This notification of the court appearance was sent over the teletype machine and an oversight of this sort is automatically placed against the detective in charge at the time the notice comes through the teletype machine. There is no right of defense on the part of the person receiving the reprimand, since it is not considered detrimental to his standing in her personnel file. This reprimand took place December 17, 1962, over 9 years ago, and it is impossible for me to recollect the reason for the oversight; however, even though the reprimand is placed against the detective in charge of that particular shift, it is the duty of each individual to check the teletype himself for notice of court appearances. The particular Detective Division to which I was assigned at that time was constantly kept busy with assignments, causing oversights of this nature by many detectives.

Tr. at 778–79.

The third reprimand identified concerned the failure to note in a logbook that an automobile had been reported on fire in a parking lot, and that a human leg had been found in the city incinerator. Smith had not been notified of this reprimand—apparently in contravention of police regulations—and had been given no opportunity to explain the oversight.

The fourth reprimand identified by the FBI concerned the failure to "receipt" a vehicle properly. Smith explained that he had signed a receipt for the vehicle, which was then parked for five days in front of the Police station, Smith then took "two

regular days off and when I went back on duty on the 8:00 A.M. to 4:00 P.M. tour the car was gone." Smith had "no knowledge of what happened to the car or when it was removed from its position." Tr. at 779.

Finally, responding to the charge of conduct unbecoming an officer, Smith asserted that "there has never been a charge of conduct unbecoming an officer in my personnel file, nor have I ever been confronted with such a charge." Smith acknowledged that such a charge could only have arisen from an indictment for the sale of a stolen automobile, and that Smith had been acquitted of this charge. Smith further stated that "since I was found not guilty of all charges, my court record was expunged, [and] no departmental charges were placed against me...." Tr. at 780.

In addition to these responses, Smith indicated that while on the Philadelphia Police Force, he had received three departmental awards and 21 "Official Commendations." During Smith's service as a term deputy, Smith had also received a "commendation for outstanding performance of duty" for averting a possible hijacking.

In summary, the four "reprimands" in Smith's record were for omissions in the nature of administrative errors. The record reveals no charge of "conduct unbecoming an officer." Smith was therefore a man who, during 27 years of service on the Philadelphia Police Force and in the Marshals Service, was honored 25 times with awards of commendations, committed four administrative oversights, and was acquitted of criminal charges lodged against him.

On February 1, 1972, Bert Lederer, who succeeded James Berryhill as Chief of Personnel, notified Smith that the Service intended to remove Smith from his position as deputy marshal effective February 4, 1972. Lederer "found" that Smith was in fact charged with conduct unbecoming an officer, despite Smith's assertion that no such charge appeared in his record. No explanation for this "finding" exists in the record, nor does the record disclose any documentation of the charge's existence. Citing this finding and the four reprimands recited

above, Lederer removed Smith "for the good of the Service." Lederer's February 1 memorandum made no effort to relate the four administrative errors committed during Smith's 27 year tenure on the Philadelphia Police Force to Smith's ability to inspect airline passengers for the Marshals Service.

On February 9, 1972, without any explanation, Lederer reversed his position and cancelled Smith's termination. Lederer's terse two-sentence memorandum stated only that Smith would not be terminated and that Lederer's letter of February 1 "is hereby cancelled." Although Lederer's memorandum of February 9 gave no reason for his sudden change of position, Lederer later testified that his decision had "in essence" been overruled by the Director of the Marshals Service, Wayne Colburn. Tr. at 235, 238.

Smith completed his probationary period with the Marshals Service without incident. On June 29, 1972, the Marshals Service requested from the Civil Service Commission a certificate of eligibles for appointment to career-conditional positions as deputy marshals. The Commission certified four names for consideration: Paul Hondros, Allen Cox, James Duross, and Anthony Pasquarella. All four applicants had obtained positions on Civil Service Registers by June of 1972. Nathan Smith, who was not at this time on a register—and who could not

have been on a register, since the Commission had not reopened the Philadelphia register until September, see pp. 284–285 supra —was not certified for consideration. Instead, the Service extended Smith's term appointment until June 30, 1975.

Thereafter, a series of events ensued that bordered on the comic. Smith obtained a position on the Philadelphia register on September 27, 1972. According to Donald Merrill, area manager of the Civil Service Commission, if the Marshals Service had requested a certificate on September 27 identical in nature to that requested on June 29, then Smith would have been ranked either first or second on the certificate.[21] Moreover, Nicholas Vinci, Chief Deputy Marshal in Philadelphia, testified that if Smith's name had been on a certificate, then Vinci would have appointed Smith to a career-conditional position.[22]

Nevertheless, for reasons that are somewhat unusual, Vinci did not request a certificate from the Commission until December 13, 1972. Vinci's delay was attributable to a special procedure adopted by the Service for the Air Piracy Program.[23] On December 11, however, President Nixon imposed a hiring and promotion freeze on all federal agencies "to remain in effect until the new federal budget is submitted to Congress some time in January [of 1973]." Tr. at 389. The Commission promptly returned

---

**21.** Merrill testified that "[i]f on September 27, 1972, the date that Mr. Smith was actually registered, if the Marshal[] Service had requested a certificate from us which would have been identical in nature to the request that we received on June 29, 1972, I can determine that Mr. Smith would have been ranked number one or number two, based on our records here." Tr. at 309–10.

**22.** Tr. at 391–92.

**23.** The Air Piracy Program posed a special problem for the Commission: the Commission was obliged to certify only those persons with adequate experience surveilling airline passengers. In order to cope with this problem, the Commission directed Vinci to recite in the Request for Certification, "Please furnish this office with a list which covers the following personnel if they meet the experience [in the]

surveillance of airline passenger[s]" and to list the names of those candidates he deemed qualified for certification. Tr. at 379–80.

Vinci was under the erroneous impression that this special procedure was a favor. See Tr. at 630. According to Vinci, "I didn't want the people at Civil Service figuring they were doing me a favor by giving it by a name request and if I was going to go over there every five minutes with another name request they were going to say, hey, that's the end of it, and then I'd really be stuck; I wouldn't be able to get anybody." Tr. at 391. Consequently, Vinci sought to minimize the number of requests made by consolidating several names on each request. In particular, Vinci delayed making a request for Smith until he could also request a certificate containing the name of David Ritho, a second applicant. Tr. at 386. Ritho did not obtain a Civil Service rating until shortly before December 13.

Vinci's December 11 request for a certificate.

For reasons that are wholly unexplained, the Commission did not keep a copy of Vinci's December 11 request on file until January. Instead, the Commission apparently regarded it as essential that Vinci file the same request a second time after the termination of the President's hiring freeze. For even more irregular reasons, however, Vinci never filed a second request.

Vinci's decision not to request a second certificate was attributable to James Berryhill, curiously the same official who sought unsuccessfully to dismiss Smith on the basis of the FBI's report on Smith's character. According to Vinci, on January 15, 1973, Bert Lederer distributed a memorandum informing Vinci and other hiring officials that term deputies who had not been "approved for conversion, pending certification from the appropriate [Civil Service] register," should take a new, nationally administered examination, "if they are not within reach of the [Deputy Marshal] register.[24] On its face, Lederer's January 15 memorandum appears not to have applied to Smith: Smith, of course, had been approved for conversion pending his certification from the Deputy Marshal register, and was within reach on the register. Nevertheless, in January James Berryhill informed Vinci personally that Vinci was "not to bother with the registers' formerly used for the appointment of career deputies because the Service planned to use a new national examination. Tr. at 394–95. In addition, Vinci testified that Berryhill said "he would get back to me about the [January 15 memorandum]." Id. Berryhill never "got back to" Vinci. As a consequence, Vinci never requested a certificate of eligibles, and Smith was never appointed to a career-conditional position.[25]

These irregularities reached their climax during the summer of 1973. The Commission postponed the announcement of its new national examination, slated to be announced in April of 1973, until August. In June of 1973, however, the United States reversed its two-year practice of staffing the Air Piracy Program with deputy marshals, preferring instead to staff these positions with private employees. Consequently, the Service "RIF'd" all term deputies appointed to the Program. The Service did not, however, "RIF" its career-conditional employees; these permanent employees had been assumed into the Marshals Service as a whole. Smith received a notice of separation under RIF procedures in June of 1973,[26] to be effective on July 27, 1973—one month before the Service announced the examination Smith was to take to enter a program that had since been terminated.

### C.

Between June and November of 1973, the Commission responded to a flurry of inquiries on Smith's behalf. At no time in any of these letters did the Service attribute its failure to "convert" Smith to the series of accidents, mistakes, and irregularities enumerated earlier. Indeed, the letter offered no suggestion that Smith was simply an unfortunate victim of circumstances. Rather, the Commission's letters reveal that Smith was not "converted" to a permanent

---

**24.** Tr. at 392–93. Lederer's announcement recited as follows:

THE FOLLOWING CIVIL SERVICE AREA OFFICES ARE NOW ACCEPTING APPLICATIONS FOR THE JUNIOR FEDERAL ASSISTANT EXAMINATION. ALL U.S. MARSHALS WHO HAVE TERM EMPLOYEES ON BOARD WHO HAVE NOT BEEN APPROVED FOR CONVERSION, PENDING CERTIFICATION FROM THE APPROPRIATE CS REGISTER, SHOULD IMMEDIATELY HAVE THEM FILE FOR THE JFA EXAMINATION ... IF THEY ARE NOT WITHIN REACH ON THE DUSM REGISTER.

Among the 58 offices listed in the announcement is the Philadelphia Civil Service office. Tr. at 8978, Appellant's Exh. 62.

**25.** On February 4, 1973, Cox and Pasquarella (both of whom had been certified during the previous summer) received permanent appointments. Tr. at 397.

**26.** James Duross and Paul Hondros were separated by RIF at the same time. Allen Cox and Anthony Pasquarella, who were appointed to permanent positions on February 4, 1973, see note 25 supra, were not separated from the Service.

position solely because of the information contained in the FBI report on his character. On June 13, for example, the Director of the Marshals Service, Wayne Colburn, responded to an inquiry from former Pennsylvania Senator Hugh Scott. Colburn stated that the three deputies, James Duross, Paul Hondros, and Nathan Smith, were not approved for conversion on the basis of information uncovered during their "background investigations."[27] Colburn later reported the same conclusion to former Pennsylvania Senator Richard Schweiker:

> Mr. Smith's official personnel folder [prepared by the Marshals Service] contains no derogatory information whatsoever. As I have previously mentioned, [the FBI] conducted a thorough background investigation of Mr. Smith which included confidential reference checks. The background investigation file [prepared by the FBI] is the only file that contains the information on which I have based my final decision not to consider Mr. Smith for full-time permanent employment.[28]

A second letter, dated November 20 from Colburn to Senator Schweiker and identified as Exhibit 38 of the Record, was to the same effect. Colburn noted that a "thorough background investigation of each deputy was conducted by the Federal Bureau of Investigation," and that on the basis of this "background investigation," "[i]t was concluded that it would not be in the best interests of the United States Marshals Service to consider Mr. Smith for permanent appointment."[29]

### D.

Smith challenged his separation from the Service with the Philadelphia Regional Office of the Civil Service Commission. On November 23, 1973, the Regional Examiner found that Smith had been properly reached for a reduction in force. Smith took an appeal to the Civil Service Commission Board of Appeals and Review on December 4, 1973, and in January of 1974 sued the Commission and the Marshals Service in the Eastern District of Pennsylvania. On April 4, 1974 the Appeals Board found no error in the Marshals Service RIF procedures and dismissed, as not germane to the appeal, whether Smith should have been retained in a permanent position.

On August 16, 1976, the district court remanded Smith's case to the Commission. Concluding that the Commission was the appropriate factfinder in these circumstances, the district court declined to conduct a *de novo* review of the facts giving rise to Smith's complaint. Accordingly, the court directed the Commission to conduct a hearing for the purposes of examining five issues raised in Smith's complaint:

(1) That his superiors promised him that he would be converted to permanent status and that he relied on this promise to his detriment.

(2) That the reason stated for his termination from the Marshals Service is a sham. According to Smith, the real reason for his termination is not the reduction-in-force concept but an unfavorable FBI report prepared in 1971. Smith further contends that at the time this FBI report was prepared, the Marshals Service did not pursue or take action against him because of the report, but instead, after he disputed the accuracy of the report, agreed to remove it from his personnel file.

(3) That he was on a valid register and should have been appointed to the position of Career Deputy United States Marshal purely as a ministerial matter.

(4) That the decision not to engage him as a Career Deputy United States Marshal was "capricious and invidious" without any reasonable basis;

---

27. Tr. at 854, Appellant's Exh. 32.

28. Tr. at 858, Appellant's Exh. 36 (letter of October 17, 1973).

29. Tr. at 861, Appellant's Exh. 38. Colburn's letter also stated erroneously that Smith "was never certified to us on a List of Eligibles since he apparently was not high enough on the register." Tr. at 862.

that no rules for the conversion of the term deputies hired to staff the Anti-Air Piracy Program were adopted; and that decisions on this subject were not made in a uniform manner.

(5) That he should be given an opportunity to dispute any unfavorable matters in the FBI report and that the FBI report contains inaccurate information.

The Commission conducted hearings between November of 1976 and February of 1977, from which the facts recited earlier have been drawn.

On July 16, 1977, the Philadelphia Field Office of the Civil Service Commission concluded that Smith had been separated in accordance with Commission regulations. After reviewing the history of events leading to Smith's separation, the Philadelphia Office found that Smith had never been certified by the Commission and was therefore properly released. Responding to Smith's contention that the Marshals Service "purposefully ensured that he was not certified by the Civil Service Commission," the Field Office concluded that "the preponderance of the evidence persuades us that officials in the Philadelphia Office of the Marshals Service did not purposefully fail to request a certificate from the Commission after September of 1972 in order to avoid the certification of [Smith]."

The "officials" in the Marshals Service to whom the Philadelphia Office referred were Chief Deputy Nicholas Vinci and Director Wayne Colburn. The Office noted that Vinci supported Smith's application, and that Colburn had overruled the attempt by Bert Lederer and James Berryhill to dismiss Smith during Smith's "trial period" of service. The Office made no finding, however, respecting whether Lederer and Berryhill led Vinci erroneously to believe that a certificate could not be requested between January and September of 1972. Moreover, the Office did not discuss Colburn's letters,

including the letter identified as Exhibit 38, stating expressly that the FBI report was the sole ground on which the Service relied in failing to convert Smith.

Finally, the Philadelphia Office found that had Smith been certified by the Commission, the FBI report would have provided a "tenuous basis" for denying Smith a permanent appointment. The Office acknowledged that Smith provided "a basis for questioning the accuracy and reliability of some of the information reported in the FBI investigation," but discounted these errors. "[W]hatever errors may have recently been discovered in the FBI report [were] of no material consequence," the Office concluded, because the Service relied on the FBI report "in good faith." Nevertheless, the Philadelphia Office attributed great weight to the Service's decision to extend Smith's term appointment for three years. Having extended Smith's *term* appointment, the Office concluded, the Service could not maintain that the FBI report made him unsuitable for *permanent* employment.[30]

On September 15, 1978, the Civil Service Commission's Appeals Review Board affirmed the decision of the Philadelphia Office. Smith renewed before the Review Board the argument, pressed before the Philadelphia Office, that the Service deliberately ensured that a certificate of eligibles would not be requested in order to avoid appointing Smith to a permanent position. Although there is, the Board found, "evidence of misunderstanding and error in the failure to request certification," the Board concluded that there is "no evidence of capricious or invidious discrimination against Smith." Like the Philadelphia Office, the Appeals Board did not discuss the roles of Lederer and Berryhill in seeking Smith's dismissal. In its only reference to Smith's challenge to the content of the FBI report, the Board recommended that Smith make use of "the provisions of the Privacy

---

**30.** The Office predicated this conclusion on the finding that differences between the duties of term and career deputies were "[i]nsubstantial." The evidence established, the Philadel-phia Office concluded, "that any difference in the duties of a term Deputy and a permanent Deputy, at least in the Philadelphia Office, were primarily theoretical." App. at 55.

Act of 1974" to dispute the report's unfavorable information.

Smith promptly renewed his challenge to the Appeals Board decision before the district court. In a memorandum filed on October 31, 1979, the district court concluded that section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706(2), limited judicial scrutiny of Smith's separation to the arbitrary, capricious, and abuse of discretion standard of review. Unlike the Commission, the district court concluded, based on a "careful review of the record," that the "real reason" for Smith's dismissal was the unfavorable FBI report. Citing Exhibit 38 of the Record, see note 29 supra, the district court found that Director Colburn "made it clear that the background information set forth in the FBI report was the main reason for not converting Smith to permanent status." App. at 74. Moreover, the district court stated the Commission itself found that "any reliance on the FBI report as a basis for denying Smith's employment would be 'tenuous.'" App. at 77. Consequently, the district court held that the Service's refusal to "convert" Smith to permanent status was arbitrary and capricious.

The district court then turned to the question of the appropriate remedy. Smith sought back pay in addition to a permanent or term position with the Service. The district court concluded that Smith's monetary claims were not "severable" from his claims for a permanent or term position. However, the district court held, jurisdiction over the monetary claim was exclusive in the Court of Claims. Accordingly, the court conditioned any order it may have issued on a withdrawal of Smith's claim for damages. Smith, however, refused to withdraw his claim for back pay, and on January 14, 1980, the district court "referred" the entire case to the Court of Claims.

The Court of Claims, however, was of a different opinion than the district court over the district court's power to "refer" Smith's case to the Court of Claims. See Smith v. United States, 654 F.2d 50, 228 Ct.Cl. 168 (1981). The power to transfer cases to the Court of Claims, that court held, derived from the former provisions of 28 U.S.C. § 1406(c). That section authorized the district courts to transfer any case within the Court of Claims' "exclusive jurisdiction" to the Claims Court. However, the court held, Smith's case is not one within the Court of Claims' exclusive jurisdiction. Smith sought reclassification to a new position—that of a permanent deputy—in addition to back pay and reinstatement to his former position—that of a term deputy. Both the Claims Court and the district court, the Claims Court held, are empowered to order reinstatement. Accordingly, the Claims Court held, Smith's case is not within that court's exclusive jurisdiction, and the district court had no power to transfer Smith's case.

Recognizing that these inconsistent judgments left Smith in an untenable position, the Claims Court urged Smith to move the district court to reconsider its holding that Smith's monetary and nonmonetary claims were nonseverable. As an appropriate disposition, the Claims Court noted, the district court might find Smith's claim for reclassification severable from his claims for reinstatement and back pay, and adjudicate this reclassification claim. See Smith v. United States, supra, 654 F.2d at 54. Smith's claims for reinstatement and back pay could then proceed in the Claims Court.

Accordingly, some nine years after these proceedings began, Smith moved the district court, pursuant to Fed.R.Civ.P. 60(b), to reconsider its holding that his monetary and nonmonetary claims were nonseverable. Enlightened by the Claims Court's opinion, on March 24, 1982, the district court vacated its prior orders and held that these claims were severable. However, the district court did not agree that Smith's claim for reinstatement should be referred to the Claims Court. Rather, relying on its power of mandamus, 28 U.S.C. § 1361 (1976), the district court ordered Smith reinstated to his term position and appointed to a permanent position. App. at 94.

The United States appeals from the district court's March 24 order. The govern-

ment argues that the record does not support the district court's conclusion that Smith's separation was arbitrary and capricious, that the district court had no jurisdiction to consider Smith's claim for reinstatement, and that the court was without authority under the mandamus statute to order Smith's appointment to a permanent position.

## II.

This case raises questions concerning judicial review, and the scope of that review, of Smith's separation from the Marshals Service, and the district court's remedial powers. We turn to these questions in turn.[31]

### A. *Scope of Review*

Smith's claim, and any remedy to which he may be entitled, rests on whether the actions of the Marshals Service in not requesting a certificate of eligibles may, under the circumstances present here, be re-

viewed under the Administrative Procedure Act. Accordingly, we turn initially to the APA to determine those actions reviewable by the courts and, to the extent that those actions are reviewable, the standard by which they must be tested.

### 1. *Actions reviewable under the APA*

At times a statute or regulation is drawn "in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971), citing S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945). In those "rare instances," *id.,* an action may be "committed to agency discretion," and thus not reviewable by a court. In such circumstances, section 10 of the Administrative Procedure Act, 5 U.S.C. § 701(a)(2) (1976), exempts the action from judicial review under the provisions of section 10(e) of the Act, 5 U.S.C. § 706 (1976).[32] However, a restriction on access

---

**31.** We address at the outset the source of our jurisdiction. Section 144 of the Federal Courts Improvement Act of 1982 provides that petitions to review final orders of the Merit Systems Protection Board—successor to the Civil Service Commission Appeals Review Board—shall be filed in the United States Court of Appeals for the Federal Circuit. *See* 5 U.S.C. § 7703(b)(1) (Supp. V 1981), *as amended by* Pub.L. No. 97–164, § 144, 96 Stat. 25, 45 (1982). The Federal Courts Improvement Act, however, applies only to notices of appeal filed after October 1, 1982. Pub.L. No. 97–164 §§ 402, 403(e), 96 Stat. 25, 57, 58 (1982). The notice of appeal in this case was filed on March 24, 1982. Section 403(e) of the Act provides that any case in which a notice of appeal has been filed in a district court prior to October 1 shall be decided by the court of appeals to which the appeal was taken. Consequently, we now have appellate jurisdiction provided that the district court properly exercised original jurisdiction. *Cf. Lancellotti v. Office of Personnel Management,* 704 F.2d 91, 98 n. 12 (3d Cir.1983) (similar conclusion for petitions for review filed in the courts of appeals before October 1, 1982).

The Civil Service Reform Act of 1978 abolished the Civil Service Commission Appeals Review Board—as noted above—and replaced it with the Merit Systems Protection Board. Pub.L. No. 95–454, § 202, 92 Stat. 1111, 1121 (1978). Section 205 of the 1978 Reform Act provided that petitions to review final orders of the Board "shall be filed in the Court of Claims

or a United States Court of Appeals"—not in the district courts. The 1978 Reform Act took effect in January of 1979. *Id.* § 907, 92 Stat. at 1227. Smith's original complaint, however, was filed in the district court in 1974, long before the 1978 Act. Accordingly, we must ask whether the district court had original jurisdiction before the 1978 Reform Act.

In *Jaffee v. United States,* 592 F.2d 712, 718–19 (3d Cir.), *cert. denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979), this court held that 28 U.S.C. § 1331 (1976) is a jurisdictional predicate for claims of nonmonetary relief under the Administrative Procedure Act. Consequently, Smith's claims for nonmonetary relief were properly before the district court of 1974. Because neither the district court's nor our jurisdiction over this case is affected by the 1978 Reform Act or the 1982 Improvement Act, we have jurisdiction over Smith's claims for nonmonetary relief.

**32.** 5 U.S.C. § 701 (1976) provides in pertinent part:

(a) This chapter applies, according to the provisions thereof, except to the extent that—

. . . . .

(2) agency action is committed to agency discretion by law.

5 U.S.C. § 706 (1976) provides in pertinent part:

The reviewing court shall—. . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

to judicial review may be effected only upon a strong showing that Congress so intended. *See* p. 295 *infra.*

In this case, Smith complains in part of the Service's failure to request a certificate of eligibles from the Civil Service Commission. Because the Commission's regulations apparently do not limit the discretion of the Marshals Service to request a certificate, and because we are aware of no similar regulations of the Marshals Service itself, the question arises as to whether the Marshals Service has unreviewable discretion to request a certificate of eligibles.

### a. Terminology

We are faced at the outset with an ambiguity in terminology that has plagued commentators and courts alike.[33] The phrase "action committed to agency discretion by law" as used in section 701(a)(2) denotes certain agency actions shielded from judicial review altogether. As Professor Davis has explained, the "two concepts 'committed to agency discretion' and 'unreviewable' have in this limited context the same meaning." 4 K. Davis, *Administrative Law Treatise* § 28.16, at 80 (1958). Thus, when the term "action committed to agency discretion by law" is employed in a section 701(a)(2) context, it is taken to mean that such action may not be reviewed by a court. In this case, therefore, if we were to conclude that the Marshals Service, by not requesting a certificate of eligibles, had taken an "action committed to agency dis-

cretion by law," it is apparent that we would be obliged to end our inquiry.

On the other hand, if an action is not one "committed to agency discretion by law," as that phrase is used in section 701(a)(2), then it *is* reviewable by the courts. Among the applicable standards of our review is that of "abuse of discretion." 5 U.S.C. § 706(2)(A) (1976). Accordingly, when an agency action is not "committed to agency discretion by law," it is subject to judicial review for abuse of discretion.

Thus dual use of the word "discretion" in sections 701(a)(2) and 706(2)(A) gives rise to a linguistic anomaly. An action taken by an agency may be one not "committed to agency discretion by law" as that term is to be construed in section 701, and yet it may be one as to which the agency retains the discretion to act, thus subjecting it to judicial review for abuse of discretion, under section 706. These meanings may always be distinguished by recalling that the phrase "committed to agency discretion by law" in section 701(a)(2) is simply a euphemism for agency discretion so broad that it is unreviewable even for abuse of discretion. Most agency discretion is not of this character. As one commentator noted, "though present in almost every agency determination, discretion is not an obstacle to the review of most decisions."[34]

### b. Third Circuit standards for action "committed to agency discretion by law"

■ Both the Supreme Court[35] and this

---

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**33.** See L. Jaffee, *Judicial Control of Administrative Action* 359–63 (1965); 4 K. Davis, *Administrative Law Treatise* § 28.16 (1958); Saferstein, *Nonreviewability: A Functional Analysis of "Committed to Agency Discretion,"* 82 Harv.L.Rev. 367, 371–77 (1968).

**34.** Saferstein, *Nonreviewability: A Functional Analysis of "Committed to Agency Discretion,"* 82 Harv.L.Rev. 367, 371 (1968) (footnote omitted).

**35.** *See Southern Ry. Co. v. Seaboard Allied Milling Corp.,* 442 U.S. 444, 454–63, 99 S.Ct. 2388, 2394–98, 60 L.Ed.2d 1017 (1979); *Chrys-*

*ler Corp. v. Brown,* 441 U.S. 281, 317–18, 99 S.Ct. 1705, 1725, 60 L.Ed.2d 208 (1979); *Dunlop v. Bachowski,* 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410–13, 91 S.Ct. 814, 820–22, 28 L.Ed.2d 136 (1971); *Association of Data Processing Service Organization v. Camp,* 397 U.S. 150, 156–157, 90 S.Ct. 827, 831, 25 L.Ed.2d 184 (1970); *Barlow v. Collins,* 397 U.S. 159, 166–67, 90 S.Ct. 832, 837–38, 25 L.Ed.2d 192 (1970); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1510–11, 18 L.Ed.2d 681 (1967); *Rusk v. Cort,* 369 U.S. 367, 379–80, 82 S.Ct. 787, 794, 7 L.Ed.2d 809 (1962).

court [36] have devoted extensive commentary to "action[s] committed to agency discretion by law." The principles governing this subject are not novel in their application. The APA's "generous review provisions must be given a 'hospitable' interpretation." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). Only "upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Id.,* quoting *Rusk v. Cort,* 369 U.S. 367, 379–80, 82 S.Ct. 787, 794, 7 L.Ed.2d 809 (1962). Thus, this court has held,

> in the absence of a specific statutory preclusion of review, agency action may be determined to be "committed to agency discretion by law" only when a fair appraisal of the entire legislative scheme, including a weighing of the practical and policy implications of reviewability, persuasively indicates that judicial review should be circumscribed.

*Local 2855, AFGA (AFL–CIO) v. United States,* 602 F.2d 574, 578 (3d Cir.1979) (footnote omitted).

■ In *Local 2855,* Judge Adams, writing for this court, held that three criteria bear on the question of the reviewability of agency action. First, as a predicate to non-reviewability, the agency must have "*broad discretionary powers,*" *id., see Southern Railroad Co. v. Seaboard Allied Milling Corp.,* 442 U.S. 444, 455, 99 S.Ct. 2388, 2394, 60 L.Ed.2d 1017 (1979); *Gatter v. Nimmo,* 672 F.2d 343, 345 (3d Cir.1982). We meant by this phrase that "in a given case there is no law to apply," not merely that statutes employ the permissive "may" or other words of discretion. *Local 2855, supra,* 602 F.2d at 578–79; *Gatter, supra,* 672 F.2d at 345.

■ Second, actions that implicate political, military, economic, or other choices "not essentially legal [in] nature in the sense that legal education and lawyers' learning afford peculiar competence for their adjustment" are not readily susceptible to judicial review, and are therefore candidates for actions committed to agency discretion. *Local 2855, supra,* 602 F.2d at 579, citing *Kendler v. Wirtz,* 388 F.2d 381, 383 (3d Cir.1968), quoting *Driscoll v. Edison Light & Power Co.,* 307 U.S. 104, 122, 59 S.Ct. 715, 724, 83 L.Ed. 1134 (1939) (Frankfurter, J., dissenting). A characteristic of these choices is their dependence on special agency expertise coupled with the absence of any "discernible guidelines" against which the expertise can be measured. *Id.* at 579, *see Concerned Residents of Buck Hill Falls v. Grant,* 537 F.2d 29, 36 (3d Cir.1976).

■ Third, even those actions "committed to agency discretion by law" are reviewable on grounds that the agency lacked jurisdiction, that the agency's decision was occasioned by "impermissible influences," or that the decision violates any constitutional, statutory, or regulatory command. *Local 2855, supra,* 602 F.2d at 580; *see Kirby v. United States,* 675 F.2d 60, 67–68 (3d Cir. 1982). *See also* Saferstein, *Nonreviewability: A Functional Analysis of "Committed to Agency Discretion,"* 82 Harv.L.Rev. 367, 372 (1968).

#### c. Application of Third Circuit standards

We turn then to the question whether the Service's decision to request a certificate of eligibles is an "action committed to agency discretion," and thus unreviewable. We are guided by the tenet that federal personnel decisions are largely discretionary, *see United States v. Testan,* 424 U.S. 392, 406, 96 S.Ct. 948, 957, 47 L.Ed.2d 114 (1976), and that there are no specific statutory or regulatory limitations on the power of an agency to request a certificate of eligibles. Nevertheless, we are loathe to conclude that the federal agencies are free to request or not request certificates in a capricious or invidious fashion, or to use the certification practice as a device for circumventing other

---

**36.** *See Kirby v. United States,* 675 F.2d 60, 67 (3d Cir.1982); *Gatter v. Nimmo,* 672 F.2d 343, 345 (3d Cir.1982); *Society Hill Civic Ass'n v. Harris,* 632 F.2d 1045, 1055 (3d Cir.1980); *Local 2855, AFGA (AFL–CIO) v. United States,* 602 F.2d 574, 578–80 (3d Cir.1979); *Concerned Residents of Buck Hill Falls v. Grant,* 537 F.2d 29, 35–36 (3d Cir.1976).

requirements of law. Only when "a fair appraisal of the entire legislative scheme ... persuasively indicates that judicial review should be circumscribed" will this conclusion be compelled. *See Local 2855, supra,* 602 F.2d at 578.

In this case, the Marshals Service misrepresented that its term deputies would be "converted" to permanent employment after the successful completion of a probationary period, a misrepresentation conceived with the intent to induce more experienced personnel to apply for term positions than would otherwise have accepted employment. In fact, of course, the Service had no authority to "convert" its term employees; those term employees who sought permanent employment were obliged, like all other candidates for employment, to obtain a position on a certificate of eligibles. *See* pp. 283–284 *supra.* Accordingly, the Personnel Officer of the Service, in an official memorandum, instructed its hiring officers to ensure that term deputies applied for career employment. *See* note 19 *supra.* Further, the Service directed its hiring officers to make use of a special procedure to ensure that those term deputies with sufficiently high scores were certified. *See* note 23 *supra.*

■ These official policy decisions of the Service make it unnecessary to decide whether, in every case, the decision to request a certificate of eligibles is, or is not, committed to agency discretion by law. In this case, the Service's representations that it would use the certification procedure to "convert" its term deputies, and its official memoranda effecting these representations, constituted an official agency program and policy providing that the certification procedure would be used to implement the agency goal of "converting" term deputies. By adopting this program, the agency obligated itself to implement the program for

"converting" term deputies in a nonarbitrary fashion. Any other conclusion would permit the Service to represent to its employees that they would be "converted," and then behave arbitrarily and capriciously with respect to these representations. In short, under the first criterion of *Local 2855,* a "fair appraisal of the entire [regulatory program]" indicates that the Service obliged itself to act nonarbitrarily in "converting" its term deputies. Judicial review as to whether the Service administered its program to "convert" term deputies arbitrarily or capriciously, is therefore appropriate.[37]

Our conclusion is reinforced by the second criterion identified in *Local 2855:* whether the agency action implicates choices political, military, economic, or otherwise peculiarly insusceptible of judicial review. The question whether the certification procedure arbitrarily and capriciously implemented the program to "convert" term deputies is the standard fare of judicial review. No delicate political or economic questions present themselves. To the contrary, we need only ask whether the Service implemented the "conversion" program in a rational, nonarbitrary, and regular fashion.

Finally, under the third criterion of *Local 2855,* we may review agency action as to whether the action violated other regulatory commands. The Service has a regularized method for evaluating its employees: the one-year "trial" or probationary period. During this period, a term or career employee may be dismissed "if he fails to demonstrate fully his qualifications for continued employment," and is afforded procedural means for challenging this finding. *See* notes 7 and 8 *supra.* In this case, the Service did not dismiss Smith during the "trial period," and while the Service represented that Smith would be "converted" to career status if he concluded this period—

---

**37.** We do not hold that the Service, by representing that it would "convert" its term deputies, forfeited all of its discretion to request or not to request certificates. That is, we do not hold that the Service obliged itself to request certificates regardless of its hiring needs at any particular time, or of other relevant factors that might have informed the exercise of its discretion. We simply hold that having promised to use the certification procedure to implement its "conversion" program, the Service thereupon obliged itself to exercise its discretion to request certificates in a rational, nonarbitrary fashion.

which he did—it did not afford Smith the probationary period for testing his suitability for employment. We may ask whether the Service deliberately used the device of failing to request a certificate of eligibles as a surrogate for avoiding these lawful means of measuring employee performance. *Cf. Keener v. United States,* 165 Ct.Cl. 334, 338 (1964); *Ritter v. Strauss,* 261 F.2d 767, 771 (D.C.Cir.1958) (RIF may not be used as surrogate for effecting discharge); *see* note 15 *supra.*

Thus, having tested the Service's actions against the criteria adopted by this court in *Local 2855, supra,* it is evident that the Service's discretion to request a certificate of eligibles is judicially reviewable. The standard by which we review that exercise of discretion is the next subject to which we turn.

### 2. Standard of review

Section 10(e) of the APA, 5 U.S.C. § 706(2)(A) (1976), provides that this court shall declare unlawful, agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." We must further decide whether the Commission's factfinding is reviewable under the substantial evidence standard of 5 U.S.C. § 706(2)(E) (1976). Section 706(2)(E) provides that the substantial evidence test shall apply to review of agency action taken after a mandatory hearing. In *Charlton v. United States,* 412 F.2d 390 (3d Cir.1969), however, this court applied the substantial evidence test to the discharge of a federal employee not accompanied by a statutory hearing. In *Twiggs v. United States Small Business Administration,* 541 F.2d 150 (3d Cir.1976), this court limited *Charlton* "to its factual context, *i.e.,* discharges of employees." *Id.* at 153. In the case of a voluntary transfer, the court held, the "arbitrary, capricious, or abuse of discretion" standard of review applies.

The district court held, and we agree, that the substantial evidence test does not apply to the Commission's findings of fact in this case. The Service's refusal to request a certificate was not a "discharge,"

but a refusal to reclassify. While the distinction is a fine one—for the effect of the refusal coupled with Smith's subsequent "RIF" was to discharge Smith—it has been recognized in other contexts. *See United States v. Testan,* 424 U.S. 392, 402, 406, 96 S.Ct. 948, 955, 957, 47 L.Ed.2d 114 (1976); *Donovan v. United States,* 580 F.2d 1203, 1206–08 (3d Cir.1978). Given the language of section 706(2)(E) and the limitation of *Charlton* "to its facts," we are not prepared to depart from this distinction here. The Commission's findings respecting the Service's refusal to request a certificate, and any claim Smith raises regarding his term appointment, are reviewable under the "arbitrary, capricious, or abuse of discretion" standard, and not the substantial evidence standard.

### B. The Merits

An action will not be deemed arbitrary, capricious, or an abuse of discretion "simply because one may happen to think it ill-considered, or to represent the less appealing alternative solution available." *Calcutta E. Court of India & E. Pakistan v. Federal Maritime Comm'n,* 399 F.2d 994, 997 (D.C.Cir.1968). We will not substitute our judgment for that of the agency. Rather, we require that the agency's action be rationally related to the purposes to be served, and supported by the facts found in the record. *See Carlisle Paper Box Co. v. NLRB,* 398 F.2d 1, 5–6 (3d Cir.1968).

We hold that the Service's failure to request a certificate of eligibles was arbitrary and capricious under this standard. First, the record is replete with mistakes, irregularities, and unexplained procedures. Indeed, the Commission itself found as a fact that there was "evidence of misunderstanding and error in the failure to request certification."

We count at least five such "misunderstanding[s]" or "error[s]" in the record: (1) the Service represented that its deputies would be "converted" to career positions in order to recruit superior candidates, when in fact the Service was fully aware that it

had no power to "convert" deputies, and must instead hire from Civil Service Registers; (2) Chief Deputy Vinci did not request a certificate of eligibles from the Commission between September 27 and December 13, 1972, for reasons which the Commission found were predicated on the mistaken belief that the Commission's procedure was a "favor" to him; (3) the Commission did not keep Vinci's December 13 request on file until January of 1973, but rather required that Vinci refile the same application, for reasons that are altogether unexplained; (4) although Smith would have qualified for "conversion" from the Philadelphia register, James Berryhill inexplicably instructed Vinci "not to bother" with these registers. Further, Berryhill indicated that he would "get back to" Vinci about these registers and never did; (5) after January of 1973, the Commission imposed an additional requirement on Smith before Smith could be "converted" to career status—the requirement that Smith take a new national examination—and then terminated the position for which he applied before this examination was given.

The effect of this extraordinary series of mistakes and irregularities is evident. Smith was promised a career position if he completed the probationary period, which he did. Moreover, Smith did everything required of him to be "converted" in accordance with the Commission's procedures. Nevertheless, the Service delayed requesting certification for no rational reason explained in the record; the Commission superimposed an additional requirement that Smith take a new examination before the Service would fulfill its obligation to "convert" him; and the Commission then postponed this new examination until after Smith was discharged. Taken together, we are satisfied that the Service's actions were arbitrary, capricious, and without rational foundation.

In addition, we conclude that the Service's actions are arbitrary and capricious for a second reason. The record makes it apparent that the real reason for these mistakes and irregularities in requesting certification was the FBI investigation of Smith's character. Indeed, in three letters to Pennsylvania's congressional representatives, Director Colburn admitted precisely this fact. See pp. 288–289 supra.

Nevertheless, the FBI report could not be a rational basis for the failure to request certification. Nothing in the report, as explicated by Smith's letter memorandum of January 19, 1972, cast doubt on Smith's ability to inspect airline passengers. To the contrary, the report revealed four administrative errors during 27 years of otherwise exemplary service. The only plausible ground for objection—the alleged charge of "conduct unbecoming an officer"—did not, according to Smith, appear in his personnel file, and nothing in the record before us indicates otherwise.

Moreover, any doubt about the unsuitability of the report as a ground for dismissing Smith was settled by the Service itself. On February 9, 1982, the Service revoked its attempt, based on the FBI report, to terminate Smith during Smith's "trial period." In June of 1972, the Service further extended Smith's term appointment for three years. The Philadelphia Office of the Commission found that in light of these actions, the FBI report provided a "tenuous basis" for denying Smith a permanent position. We agree. The proper time for evaluating an employee's performance is during the trial or probationary period. Once the Service approved of Smith's performance by extending his term appointment for three years, it established that acts which occurred before the probationary period were not grounds for terminating Smith's employment after this period. Nor can the Service argue that the duties of term and career deputies differed, justifying Smith's appointment as a term deputy but not as a permanent deputy. The Philadelphia Office found that no significant difference between these duties existed, and we respect this finding of fact. Accordingly, the FBI report could not be the basis for denying Smith either term or permanent employment. For the same reason, the Service could not use the certification proce-

dure as a device for achieving the same result.

### C. The Remedy

There remains before us the question of the appropriate remedy for these agency actions. The district court held that its power to order relief derived from the mandamus statute, 28 U.S.C. § 1651 (1976), and ordered Smith (1) reinstated to his term position, and (2) reappointed to a permanent position "at that level and grade he would be entitled to had he been appointed to the position of career deputy United States marshal in 1973 and had served continuously until today."

We conclude that the district court's power to order relief derives not from the mandamus statute, but from section 10 of the Administrative Procedure Act, 5 U.S.C. § 706(1). We also conclude that the district court erred in appointing Smith to a term position. However, we will affirm that portion of the district court's order directing that Smith be appointed to a permanent position at an appropriate grade and salary.

#### 1.

■ The Supreme Court has consistently held that the remedy of mandamus "is a drastic one, to be invoked only in extraordinary situations." *Allied Chemical Corp. v. Daiflon, Inc.,* 449 U.S. 33, 34, 101 S.Ct. 188, 189, 66 L.Ed.2d 193 (1980) (per curiam). The writ will issue only when "a party seeking issuance [has] no other adequate means to attain the relief he desires," and when the "right to issuance of the writ is 'clear and indisputable.'" *Id.* at 35, 101 S.Ct. at 190, quoting *Bankers Life & Casualty Co. v. Holland,* 346 U.S. 379, 384, 74 S.Ct. 145, 148, 98 L.Ed. 106 (1953).

■ When appointment to a position of employment is sought, the right to mandamus is "clear and indisputable" only when the party seeking appointment has a right or entitlement to employment based on statute or regulation. *See Donovan v. United States,* 580 F.2d 1203, 1208–09 (3d Cir.1978). If the appointment sought is not a "clear legal entitlement," but rather a matter subject to agency discretion, mandamus will not lie.

■ No statute or regulation mandated the appointment of Smith to a career-conditional position. Any decision to appoint Smith was instead subject to the informed exercise of the Marshals Service's discretion and, as we have held, reviewable for abuse of discretion. "Where a matter is committed to discretion, it cannot be said that a litigant's right to a particular result is 'clear and indisputable.'" *Allied Chemical Corp. v. Daiflon, Inc., supra,* 449 U.S. at 36, 101 S.Ct. at 190. Accordingly, mandamus is not available to compel Smith's appointment to a permanent position.[38] For similar reasons, mandamus would not be available to appoint Smith to a term position.

#### 2.

■ Although we hold that mandamus will not support an order appointing Smith to permanent employment, Smith is not thereby deprived of all judicial remedies. Section 10(e) of the APA provides that the reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1) (1976). This section further provides that the reviewing court shall "hold unlawful" agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a) (1976). It is apparent that an "arbitrary and capricious" action is one that is "unlawful" within the meaning of section 706(1), and that

**38.** The district court relied on a dictum in *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), for the proposition that relief by writ of mandamus was available. In the passage upon which the district court relied, the Supreme Court suggested that the employee there had "[a] second possible avenue of relief ... by way of mandamus under 28 U.S.C. § 1361, in a proper federal district court." *Id.*

at 403, 96 S.Ct. at 955. The Supreme Court did not, however, thereby hold that mandamus would always be available to effect a "reclassification" of employees, or abrogate the traditional requirements of mandamus in these cases. Mandamus continues to be available only if a "clear legal entitlement" to reclassification is shown.

when an agency arbitrarily or capriciously withholds action, we may "compel" the agency to act under this section. Accordingly, section 706(1) authorizes injunctive relief to compel an appointment arbitrarily or capriciously withheld.

Our interpretation accords with that of the Tenth and District of Columbia Circuits. These courts have held that section 706(1) is a source of injunctive relief to remedy an arbitrary or capricious delay or denial of agency action. *See Carpet, Linoleum & Tile Layers, Local Union No. 419 v. Brown,* 656 F.2d 564, 566–67 (10th Cir.1981); *Health Systems Agency of Oklahoma, Inc. v. Norman,* 589 F.2d 486, 492–93 (10th Cir. 1978) (failure to accept application an abuse of discretion; court directed that application be considered); *M. Steinthal & Co., Inc. v. Seamans,* 455 F.2d 1289, 1305–06 (D.C. Cir.1971) (preliminary injunction may issue when requisite standards are met); *see also Wheelabrator Corp. v. Chafee,* 455 F.2d 1306, 1316–17 (D.C.Cir.1971). Indeed, any other interpretation would render the standards of section 706 meaningless; were it otherwise, the federal courts would be powerless to redress agency action found arbitrary or capricious.

3.

■ We have concluded that section 706(1) authorizes this court to compel agency action arbitrarily or capriciously withheld. Because the action unlawfully withheld by the Service was the failure to request a certificate of eligibles from which Smith would have been appointed to a permanent position, the district court is authorized by section 706(1) to compel Smith's appointment to a permanent position. We agree with the district court that Smith must be appointed to that grade and salary he would have enjoyed had the Service not unlawfully withheld his appointment.[39]

■ We also concur with the district court that we lack jurisdiction over Smith's claim for backpay in excess of $10,000. *See* 28 U.S.C. § 1346(a)(2) (Supp. V 1981). We cannot agree, however, that the Service also be directed to reinstate Smith to his term position, a position that expired by its own terms in 1975. The Service did not unlawfully withhold Smith's appointment to a term position; to the contrary, the Service appointed Smith to a term position in lieu of "converting" him to permanent employment. The only action unlawfully withheld by the Service was Smith's appointment to *permanent* employment. Accordingly, Smith's appointment to a term position was not agency action "unlawfully withheld." To that extent, and without regard to whether Smith's reinstatement to a term position and our disposition directing his appointment to a permanent position would be consistent, *see* note 41 *infra,* section 706(1) does not authorize the district court to compel the Service to reinstate him.

Our disposition of these claims permits us to untie the jurisdictional knot tied by prior orders of the Claims Court and the district court in these proceedings. In its order of October 31, 1979, the district court held, citing *Cook v. Arentzen,* 582 F.2d 870 (4th Cir.1978), that any claims by Smith for injunctive relief were "nonseverable" from Smith's claim for monetary damages in excess of $10,000. By "nonseverable," the district court meant that the Court of Claims had exclusive jurisdiction over Smith's monetary and nonmonetary claims. *See Cook, supra,* 582 F.2d at 878.

As previously observed, however, the Court of Claims disputed the district court's interpretation of its own jurisdiction. Citing *Cook v. Arentzen* with disapproval, the Court of Claims held that both that court and the district court had jurisdiction over

---

**39.** Our disposition of this case does not usurp the Service's ordinary discretion to choose among the three eligibles ranking highest on a certificate "with sole regard to merit and fitness." 5 C.F.R. § 332.404 (1983); *see* p. 281 *supra.* Rather, the record reveals that Smith would have been first or second on a certificate had one been requested, and that had Smith been on a certificate, he would have been appointed to a permanent position. *See* p. 287 *supra.* Consequently, we are simply holding the Service to what the record reveals: that the Service's discretion would have been exercised in favor of Smith. *Cf. Kunda v. Muhlenberg College,* 621 F.2d 532, 554–55 (3d Cir.1980) (Garth, J., concurring and dissenting).

Smith's claim for reinstatement. *See Giordano v. Roudebush,* 617 F.2d 511, 514–15 (8th Cir.1980). Consequently, the Court of Claims held, the district court was without power to transfer Smith's claim for reinstatement to the Court of Claims under the former provisions of 28 U.S.C. § 1406(c). That section—now repealed by the Federal Courts Improvement Act of 1982, § 132(1), Pub.L. No. 97–164, 96 Stat. 25, 39—provided that the district courts may transfer "a case within the exclusive jurisdiction of the Court of Claims" to that court. Moreover, the Court of Claims was without jurisdiction to consider Smith's second claim for permanent appointment. *See United States v. Testan, supra.* Accordingly, the Court of Claims held that the district court was without power to transfer any of Smith's nonmonetary claims to that Court. *See Smith v. United States,* 654 F.2d 50, 53, 228 Ct.Cl. 168 (1981).

Whether the Court of Claims also held that the district court was without power to transfer Smith's *monetary* claim is unclear. Although the former provisions of 28 U.S.C. § 1406(c) refer to the transfer of a "case," and not to individual claims within a case, the Court of Claims "suspended" proceedings in that court pending the district court's reconsideration of its own jurisdiction. *See Smith v. United States, supra,* 654 F.2d at 54. We cannot discern from the record whether the Claims Court continues to exercise jurisdiction over Smith's claim for back pay, and whether the Claims Court

would exercise jurisdiction over Smith's claim for reinstatement in light of this court's opinion.

Because we conclude that the district court lacked the power in this case, under the mandamus statute and the APA, to order Smith's reinstatement, it is patent that the only proper forum in which to raise the reinstatement claim, if that claim is still viable, is the Claims Court. Therefore, we need not resolve the dispute whether, if the district court *did* have the power to order reinstatement under the APA, it would nonetheless have been barred from doing so because the Claims Court must exercise exclusive jurisdiction over such claims. *Compare Keller v. Merit Systems Protection Board,* 679 F.2d 220, 221–22 (11th Cir.1982) (per curiam) *and Cook v. Arentzen, supra,* 582 F.2d at 878, with *Giordano v. Roudebush, supra,* 617 F.2d at 514–15.[40]

▮ In addition, we conclude that with the repeal of 28 U.S.C. § 1406(c) by the Federal Courts Improvement Act of 1982, we may transfer a case to the Claims Court "if it be in the interest of justice" under 28 U.S.C. § 1406(a) (1976) without regard to whether the case is within the "exclusive jurisdiction" of that court.[41] We further conclude that Smith's claims for reinstatement and back pay are severable from his claim for permanent employment, and that these claims for reinstatement and back pay constituted a "case" under the provisions of 28 U.S.C. § 1406(a). Accord-

**40.** Chief Judge Seitz would not reach this issue for a different reason. In Chief Judge Seitz' view, Smith's claim for term reinstatement amounts to no more than a disguised claim for monetary damages, since at the time that Smith filed his complaint, the United States no longer staffed the Air Piracy Program with term deputy marshals. On that basis, Chief Judge Seitz believes that Smith's claim for term reinstatement was properly transferred to the Court of Claims by the district court in 1980. *See e.g., Hoopa Valley Tribe v. United States,* 596 F.2d 435, 436, 219 Ct.Cl. 492 (1979) (where prime effort of claim is to obtain money damages from the Federal Government, the Court of Claims' exclusive jurisdiction over non-tortious (above $10,000) claims cannot be evaded or avoided by framing a district court com-

plaint to appear to seek injunctive, mandatory, or declaratory relief).

**41.** The legislative history of the Federal Courts Improvement Act does not speak to the purpose of the repeal of § 1406(c). *See* S.Rep. No. 275, 97th Cong., 2d Sess. 22, 1982 U.S.Code Cong. & Ad.News 11, 32. We cannot conclude, however, that Congress intended to handcuff the federal courts by prohibiting them from transferring a case improperly filed in the district courts to the Claims Court when the interests of justice so require. We conclude instead that Congress intended to eliminate the cumbersome requirement—and the attendant jurisdictional complexities, as evinced by this case—that a case be within the "exclusive" jurisdiction of the Claims Court in order to invoke the transfer provision of § 1406(a).

ingly, we will direct the district court to transfer these claims to the Claims Court for their disposition by that court.[42]

### III.

We will affirm the March 24, 1982 order of the district court insofar as it vacated its earlier orders and directed the Marshals Service to appoint Smith to a permanent position "at that level and grade he would be entitled to had he been appointed to the position of career deputy United States Marshal in 1973 and had served continuously until today." We will vacate the remaining portion of the district court's order, which required the Marshals Service to reinstate Smith to a term position, and remand to the district court for proceedings consistent with this opinion.

ADAMS, Circuit Judge, concurring.

Although I agree with the result reached by the majority, I write separately primarily to emphasize the narrowness of today's holding. First, as I understand the case, the Court holds that the combination of erroneous decisions and delays which resulted in the denial of a career appointment to Nathan Smith was sufficiently inordinate to be unlawful. We do not suggest, however, that bureaucratic negligence will inex-

orably rise to the level of "arbitrary and capricious action" for purposes of the Administrative Procedure Act ("APA"). Second, in reversing the district court's order to reinstate Smith to his term position, the Court is not in any way passing on the merits of Smith's claim that he was wrongfully discharged from his old post. Rather, as I analyze the remedy issue, the order directing that Smith be appointed to a career position rendered moot any nonmonetary claim based on Smith's discharge from his term position. To ensure that the decision not be misconstrued, I add the following explanation.

### I.

Because the Marshals Service officially represented that term deputies for the Anti-Air Piracy Program would be "converted" to career status after successfully completing a period of probation,[1] the Court holds that the agency committed itself to conducting a regular program of "conversion" in a nonarbitrary and noncapricious manner. This commitment imposed a judicially reviewable limit on administrative discretion, a limit unrelated to the fact that the conversion program was not authorized. It therefore seems unnecessary to assert that statements by certain members of the

---

**42.** Even if we were without power to transfer this case to the Claims Court under § 1406(a), our disposition of this appeal makes it apparent that Smith's claims for reinstatement and back pay were properly transferred to the Claims Court by the district court in January of 1980 under the former provisions of 28 U.S.C. § 1406(c). This conclusion follows because, as we have now held, the district court lacked power in this case to order reinstatement. Consequently, Smith's reinstatement claim was within the "exclusive jurisdiction" of the Court of Claims as that phrase appeared in section 1406(c). If the Claims Court, by "suspending" proceedings in that court, continues to exercise jurisdiction over these claims, then the court may choose simply to rely on its jurisdiction deriving from the district court's 1980 transfer.

We note as well that our disposition of this appeal may moot any claim for appointment to a term position. Smith seemingly cannot be appointed to two positions simultaneously, and the career appointment is apparently the superior of the two. Nevertheless, the record does

not reveal whether benefits of any kind may turn on Smith's having completed the service of his term position. This question is properly left to consideration by the Claims Court.

Our disposition of this appeal makes it unnecessary to consider whether Smith could prevail under the doctrine of *Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959).

**1.** The many statements by members of the Marshals Service assuring new term deputies that they would be converted, *see esp.* Tr. at 127, 617–18, 639–41, may not have been sufficient to constitute an official commitment by the agency. These representations were, however, confirmed as a policy of the agency by the June 16, 1972 memorandum from the Personnel Officer for the Marshals Service directing that the field offices begin the "process of converting term deputies to career conditional appointments." Tr. at 803, Appellant's Exh. 25.

Service were "misrepresentations,"[2] and I do not join any suggestion to that effect. Additionally, the Service's self-imposed limit on discretion did not depend on the details of the statutes and rules governing employment in the competitive and excepted service. Consequently, I do not join the extensive discussion in Part I.A., *supra,* Maj.Op. at 280–283, insofar as it might be interpreted as controlling statements of law, rather than factual background only.

Nevertheless, the majority is surely correct that the actions of the Marshals Service in this case are not immune from judicial review under section 10 of the APA, 5 U.S.C. § 701(a)(2) (1976). Given the Service's commitment to a regular program of conversion, it cannot be said that the agency has such "broad discretionary powers" that "there is no law to apply." *Local 2855, AFGA (AFL–CIO) v. United States,* 602 F.2d 574, 578–9 (3d Cir.1979); *Gatter v. Nimmo,* 672 F.2d 343, 345 (3d Cir.1982). The question whether the Service's program was conducted in a nonarbitrary and noncapricious manner presents a classic legal choice well-fitted to the "peculiar competence" of courts. *Local 2855, supra,* 602 F.2d at 579. In view of the presumption favoring judicial review under the APA, *id.* at 578, the Service's actions in this proceeding are not committed solely to agency discretion by law under 5 U.S.C. § 701(a)(2), and are therefore reviewable.

I also am in accord with the majority's conclusion that the appropriate standard for review is the "arbitrary and capricious" test of 5 U.S.C. § 706(2)(A) (1976). Since federal personnel decisions must be accorded substantial deference, *see United States v. Testan,* 424 U.S. 392, 406, 96 S.Ct. 948, 957, 47 L.Ed.2d 114 (1976), and since the Service's failure to convert Smith does not fall squarely into the category of a discharge, I agree that there is no reason to extend the rule of *Charlton v. United States,* 412 F.2d 390 (3d Cir.1969), and apply the "substantial evidence" standard of 5 U.S.C. § 706(2)(E) (1976).

What most concerns me about today's decision is that the majority's application of the "arbitrary and capricious" test not be misinterpreted. Judge Garth points to two reasons why the Service's failure to convert Smith to career status was arbitrary and capricious: first, the series of five "misunderstandings and errors" which delayed the Service in requesting Smith's name on a certificate of eligibles from June 30, 1972—when he had successfully completed his probationary period—until after his dismissal pursuant to a Reduction in Force ("RIF"), *see* Maj.Op. at 295–296; and second, the Service's continued reliance on the FBI Report after deciding to extend Smith's term appointment beyond his probationary period. *See* Maj.Op. at 296–297. My understanding of this holding is not that, strictly speaking, these are two independent grounds for finding the government's actions arbitrary and capricious, but rather that the two grounds are closely interrelated. When, as here, the government establishes a program whereby term deputies who successfully complete their probation period will be converted to career status and a series of delays prevents an employee from being converted after successful completion of the probationary term, the government must either rationally explain the delays or rationally explain its decision not to correct the effect of the delays.

In this case, the government did neither. To say that the delays resulted from "misunderstanding and error," as did the Civil Service Commission Appeals Review Board, App. at 65, is not a sufficient explanation. The government's refusal to correct the effect of the delays was justified only by reference to the FBI Report. The Service conceded as much in its three letters to the Senators from Pennsylvania. Tr. at 854,

---

**2.** *See* Maj.Op. at 294. I am aware that generally the government cannot be estopped by the unauthorized statements of its agents, *see Schweiker v. Hansen,* 450 U.S. 785, 788–90, 101 S.Ct. 1468, 1470–71, 67 L.Ed.2d 685 (1981), *Jackson v. United States,* 573 F.2d 1189, 1197,

217 Ct.Cl. 25 (1978), and that therefore we must make clear that no program of conversion is authorized by federal statute or regulations. To say this, however, does not mean that members of the Marshals Service engaged in "misrepresentation."

858 and 861; Appellant's Exh. 32, 36 and 38. Yet, the Service had itself effectively repudiated the FBI Report after rescinding its February 1972 termination order and reappointing Smith for a new 3-year term as a temporary deputy. In light of the Service's implicit admission that the FBI Report was irrelevant, its subsequent reliance on the Report was manifestly irrational.[3] Thus, the errors and misunderstandings that delayed Smith's conversion, when taken together with the Service's reliance on the FBI Report, rendered arbitrary and capricious the failure to convert Smith.

## II.

I concur in the holding that under 5 U.S.C. § 706(1) (1976) Smith should be appointed to a permanent position at the grade and salary he would have attained had the Service not unlawfully withheld his appointment. I also agree that Smith's claim for back pay in excess of $10,000 must be heard by the Court of Claims. 28 U.S.C. § 1346(a)(2). Finally, I am in accord with the conclusion that the district court should not have decided Smith's claim for reinstatement to a term position. But I cannot join entirely with the reasoning of my colleagues in reaching this result.

To my mind, the district court's order to appoint Smith to a career position mooted his claim for term reinstatement. The injunction directing Smith's career appointment can be conceptualized as a 2-step remedy: first, an order to reinstate Smith to a position comparable to his old term appointment; second, an order to promote Smith from his old post to a career position. Once the district court directed that Smith be appointed to the permanent post he would have held absent the Service's improper conduct, any additional injunction directing Smith's reinstatement became redundant.

To that extent, Judge Garth is correct that the district court "lacked power" to issue a separate order for term reinstatement. *See* Maj.Op. at pp. 298, 299.

The mootness of Smith's claim for term reinstatement does not, however, justify the conclusion that the term position was "not unlawfully" withheld. *See* Maj.Op. at 298. Conceivably, Smith's allegation that he was unlawfully discharged from the term position states a cause of action under 5 U.S.C. § 706(1). But for the Service's arbitrary and capricious failure to "convert" Smith, he would not have been within the ambit of the 1973 RIF in the first place. Because of these peculiar facts, the Service's refusal to exempt Smith from its 1973 RIF may have constituted "agency action unlawfully withheld" for purposes of section 706(1). We need not reach this difficult issue, however, since the injunction directing a permanent appointment necessarily incorporates the nonmonetary relief that might be granted for a wrongful discharge from the term position. Our disposition of this case does not moot any monetary claims premised on Smith's discharge from the term position, but such monetary relief—being part of a claim for damages in excess of $10,000—falls within the exclusive jurisdiction of the Claims Court.

Thus I agree with Chief Judge Seitz that any remaining claims based on Smith's discharge from his term position are monetary. Chief Judge Seitz, however, reaches this conclusion by reasoning that the demand for term reinstatement can amount only to a disguised claim for monetary damages. *See* Maj.Op. at 299 n. 40. In practical terms, there appears to be no difference between viewing the issue as a mootness problem, as I do, or as a "disguised monetary claim" problem, as does Chief Judge Seitz. But analytically I do not think this case falls squarely within the principle of

---

**3.** As I read it, the majority opinion does not hold that, prior to implicitly repudiating the FBI Report, the Service could not rationally consider the Report's indication that a candidate for career status had received four reprimands and a charge of "Conduct Unbecoming an Officer." *See* Maj.Op. at 296. Indeed, such marks on the record of a potential career marshal could be sufficient to show a candidate's unfitness for permanent appointment, even if the Report also contains "uncorroborated hearsay and innuendo." *See id.* at 284 n. 20.

*Hoopa Valley Tribe v. United States,* 596 F.2d 435, 436, 219 Ct.Cl. 492 (1979), or the decisions which require immediate referral to the Court of Claims when a case contains no substantial nonmonetary claims. *See Denton v. Schlesinger,* 605 F.2d 484 (9th Cir.1979); *Polos v. United States,* 556 F.2d 903 (8th Cir.1977). Smith's claim for relief involves a substantial nonmonetary demand for career appointment which, as the Court of Claims explained, *Smith v. United States,* 654 F.2d 50, 52, 228 Ct.Cl. 168 (1981), could be heard only by the district court. Moreover, had we not mooted the nonmonetary claims arising from Smith's term discharge, his term reinstatement also might have provided a substantial basis for retaining jurisdiction in the district court. I therefore prefer to analyze the vexing jurisdictional problem of this case in terms of mootness.

Although the district judge did not explain his unusual order directing that Smith receive both permanent appointment and term reinstatement, I suspect that this remedial approach was chosen out of an apprehension that *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), might foreclose Smith from asserting a backpay claim if he received only an order for permanent appointment. I too am concerned that the Court not inadvertently deprive Smith of his claim for damages, but I do not believe it does so today. The *Testan* opinion makes clear that the Court of Claims may not award back pay for a position to which a plaintiff has not been appointed. Since Smith was appointed to and did serve in a term position until his discharge, *Testan* would appear to pose no barrier to a backpay claim based on the term position. As for backpay based on Smith's career appointment, I am not persuaded that *Testan* bars a backpay award to a plaintiff who, by order of a district court, has been appointed to a career position that the court determined had been arbitrarily and capriciously withheld; *Testan* did not decide such a question. In interpreting its own jurisdiction to hear Smith's case, the Court of Claims dealt ambiguously with the *Testan* problem, but in-

timated by its construction of *Phillips v. United States,* 227 Ct.Cl. 532 (1981), that it could consider a backpay claim based on Smith's wrongfully withheld career position once he had received a career appointment. *Smith v. United States, supra,* 654 F.2d at 53; *but see id.* at 52 ("We still could not give the employee back pay for a position to which he was not appointed . . ."). These issues must be resolved in the first instance by the Court of Claims, but I wish to emphasize that, at least as I view it, the decision today does not reject the merits of any claim regarding the term position Smith may make in the Claims Court.

### III.

With the understanding that the result reached by the Court rests on the entire combination of circumstances that prevented Smith's conversion to career status and that we do not in any way reach the merits of Smith's claim that he was wrongfully discharged from his term position, I concur.